**Beverly C. CHEW et al., Applicants,**

**v.**

**INVERNESS MANAGEMENT CORPORATION, a Delaware Corporation, et al., Respondents.**

Court of Chancery of Delaware, New Castle.

Submitted Jan. 28, 1976.

Decided Feb. 13, 1976.

Reargument Denied Feb. 20, 1976.

Hugh Corroon and Michael D. Goldman of Potter, Anderson & Corroon, Wilmington for applicants.

William Prickett and Richard I. G. Jones of Prickett, Ward, Burt & Sanders of Wilmington, and John P. Campbell of Curtis, Mallet-Prevost, Colt & Mosle of New York City, for respondents.

MARVEL, Vice Chancellor.

This litigation was commenced as an application under the review of corporate election provisions of 8 Del.C. § 225 for the setting of a hearing date followed by a determination by the Court of the validity of a purported election of a board of directors of the respondent Inverness Management Corporation, the applicants praying, inter alia, that they together with Walter L. Ross, II, John Campbell, and Enno W. Ercklentz, Jr., be found to have been elected directors of the corporate respondent by such election and declared to comprise the duly elected board of directors of the respondent corporation. The election in question was purportedly accomplished by means of the alleged consent [1] of more than fifty percent of the total authorized and outstanding voting stock of the respondent corporation as permitted by 8 Del.C. § 228(a) which allows dispensing with the need of an actual meeting of stockholders and permits a vote to be taken by the consent in writing of the required number of all of the outstanding shares of stock in a corporation in order to accomplish what would otherwise require the stipulated percentage of the votes of those present at a meeting of stockholders. It reads as follows:

"(a) Unless otherwise provided in the certificate of incorporation, any action required by this chapter to be taken at any annual or special meeting of stockholders of a corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without

---

1. Such consent was initially purportedly accomplished by a document dated December 23, 1975 in which Rosalie C. Culver was credited with 2,716 votes in favor of the slate of the consent group when she should have been credited with only 591 votes, the other shares in question in which she held a beneficial interest being registered in the name of her investment advisor, Centra & Co., thus preventing the required majority. On January 7, 1976, a new consent document was presented which included votes for the slate of the consent group of all of the shares in which Mrs. Culver held a beneficial interest.

prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted."

First of all, I am satisfied after trial that the formation of the so-called consent group may be attributed to two factors, namely the poor performance of the respondent Inverness Management Corporation over recent years and the termination of the services of the applicants Chew and Winslow as officers and directors of the respondent corporation.

Inverness Management Corporation is an investment holding company the assets of which are basically held by four wholly-owned subsidiaries, namely Inverness Land & Cattle Management, Inc., Aunt Millie's Sauces, Inc., Inverness Counsel, Inc., and Inverness Travel, Inc., the corporate title of each such subsidiary being explanatory of the nature of its business.

There are approximately one hundred fifty stockholders of Inverness Management Corporation, each such stockholder holding shares of stock of one or more of the three classes of the presently authorized and outstanding stock of the corporation, namely common, Class A preferred, Class B preferred, and Class C preferred. Class A preferred stock has a preferential voting right of 12.5 votes per share based on a right to convert each such share into the same number of shares of common stock. Significantly, the Class C preferred stock, each share of which carries one thousand votes, was not authorized to be issued and none of such shares was issued until after the consent document of December 23, 1975 had been presented to members of what up to then had been the respondent corporation's incumbent management.

The issuance of one hundred shares of such stock to respondent's chief executive officer, the respondent Garrick C. Stephenson, after his purported removal as a director of the respondent corporation through the consent procedure authorized by 8 Del.C. § 228(a) is attacked by plaintiff in an amended application as an obvious stratagem designed to retain or regain corporate control, which up to the filing of the consent paper of December 23, 1975 had been securely held in the hands of the respondent, Stephenson and his associates, *Condec Corporation v. Lunkenheimer Company,* Del.Ch., 230 A.2d 769 (1967). Similarly attacked by the applicants in their amended application is the issuance to Mr. Stephenson of 25,000 shares of common stock of the respondent corporation purportedly in partial reduction of the latter's substantial loans to the respondent corporation in a conversion pro tanto of such debt to common stock, action which had been advised by the respondent Mr. Hanes for some time before.

Both Mr. Chew and Mr. Winslow served as officers of the respondent corporation until their resignations as corporate officers, the latter having resigned as executive vice president of the corporate respondent in March, 1975, and the former as vice president in April 1975. They continued briefly to serve on the board of the corporate respondent after such resignations although their advice and suggestions appear to have been ignored. Neither was reelected to the board of directors of Inverness Management Corporation at the annual meeting of stockholders of such corporation held in June, 1975.

Their management positions with the corporate respondent having been terminated, applicants evidently reached an understanding on a course of action to be taken designed to supplant the Stephenson dominated board of directors with one of their own, a proposal which was advanced by the presentation of a plan of corporate revitalization to the understandably dissatisfied stockholders of the respondent corpo-

ration as a result of the poor performance of their investments in Inverness Management Corporation over recent years, its common stock having plummeted to an estimated negative value of three dollars per share in mid-1974 and the value of the Class A preferred and Class B preferred having been eroded by the financial reverses suffered by the corporate respondent. At first consideration was given by applicants and their associates to calling a special meeting of stockholders to consider the replacement of a majority of the Stephenson controlled board by applicants' own candidates, including themselves, but felt that were such course of action taken it would serve as a red flag to incumbent management and result in what ultimately was sought to be accomplished after the filing with incumbent management of the vote of stockholders purportedly accomplished ·by statutory consent under the provisions of 8 Del.C. § 228, namely the improper issuance of additional shares for the purpose of holding or regaining control of the management of the respondent corporation.

Apart from having operated at a deficit for several years prior to the end of 1975, Inverness Management Corporation has had debt problems for at least five years, having borrowed $500,000 in 1971 from the Chase Manhattan Bank on Mr. Stephenson's guaranty of December 1, 1971, which amount was almost immediately taken down. In connection with such guaranty Mr. Stephenson deposited with the lending bank 10,000 shares of common stock of Proctor & Gamble Company as collateral. By the end of 1975, as he continued to pump money into Inverness Management Corporation, Mr. Stephenson had become a creditor of the respondent corporation in the total amount of $2,200,000.

Where applicants and their associates basically parted company with Mr. Stephenson and his associates and which led to applicants' efforts to take over from incumbent management was over how best to seek to rescue the respondent corporation from its doldrums, applicants Chew and

Winslow being of the opinion that they are better qualified than the individual respondents to bring about a reversal of the losing trend of the respondent corporation, while the purportedly ousted Stephenson group, working primarily on retrenchment plans, particularly in space occupied, and the generation of needed cash through the sale of Aunt Millie's and part of the ranch property, as proposed by the respondent Hanes, and pointing to the fact that there was a corporate profit for the third quarter of 1975, naturally contend that they are better qualified than applicants to rescue the respondent corporation from the threat of liquidation and what would then become an inevitable and irreparable loss to its stockholders. Particularly stressed by the individual respondents are the possible consequences to the corporation, in the event of a judgment for the applicants, resulting from an attempted withdrawal of financial support to the corporation by Mr. Stephenson.

■ In my opinion, however, the first question to be answered is whether or not some twenty-five percent or approximately 30,000 of the votes ostensibly procured by applicants in the form of consents in writing for the election of applicants' slate of proposed directors having been procured through the use of options to purchase such shares in return for which a consideration was paid, such votes should be disenfranchised.

In other words, in order to obtain from a stockholder a proxy coupled with an interest and so irrevocable, the consent group made a payment of ten cents per share in return for the offer of an option to purchase the shares in question at a price which was generally fixed at twenty dollars per share (although prices ranged as high as sixty and even eighty dollars) for stock of dubious value, Inverness Management Corporation's common stock having a negative value at the time of three dollars a share. In response to such overtures, as noted above, some twenty-five percent of the consenting stockholders in question gave the applicant group irrevocable prox-

ies to vote their optioned shares either at a meeting of stockholders or by way of consent.

By such stratagem applicants were able to forestall any last minute persuasion (see 8 Del.C. § 228(c)) which might have been applied by Mr. Stephenson and his associates in an effort to persuade stockholders to switch votes (as happened in the case of the vote of George G. Mason, II, whose vote had been obtained by applicants without the giving of an irrevocable proxy and was later revoked), and as would be the case in the give-and-take of a conventional meeting of stockholders, Folk, The Delaware General Corporation Law, p. 279.

And while the price of ten cents a share given to obtain an irrevocable proxy is not substantial, it must be borne in mind that the common stock of the respondent corporation was at the time well under water to the extent of three dollars, while the value of Class A preferred and Class B preferred had become severely eroded. In other words, in a bleak situation, insofar as Inverness Management Corporation was concerned, a relatively small group of investors of some sophistication, when presented with an attractive option price and a modest cash payment, responded as might be expected and the votes of some twenty-five percent of the outstanding shares of the respondent corporation were obtained by the giving of irrevocable proxies in return for a cash consideration.

It is stated in Fletcher, Cyclopedia, Corporations, (Rev.Ed.1967) § 2066.

"So any agreement by a stockholder to sell his vote or to vote in a certain way, for a consideration personal to himself is contrary to public policy and void."

See also *Macht v. Merchants Mortgage & Credit Company*, 22 Del.Ch. 74, 194 A. 19 (1937) in which the Court stated:

"As to the 224 shares which Sigmund Ades, Harry Ades and Sylvia Ades Norinsky hold as a 'Protective Committee,' my conclusion is that they should not

be permitted to vote. The deposit of these shares with the committee by the various holders was secured by paying out money to the depositing stockholders as an inducement to them to do so. * * * In so far as the voting power of these shares is concerned, I think there can be no doubt that it was purchased. To allow voting rights that are bought to be exercised is against public policy, and would be in fraud of the other stockholders. *Dieckmann v. Robyn,* 162 Mo. App. 67, 141 S.W. 717; *Brady v. Bean,* 221 Ill.App. 279; *Smith v. San Francisco, etc., Co.,* 115 Cal. 584, 47 P. 582, 35 L.R.A. 309, 56 Am.St.Rep. 119."

See also *Hall v. John S. Isaacs & Sons Farms, Inc.,* 37 Del.Ch. 530, 146 A.2d 602 (1958) affirmed, Del.Supr., 39 Del.Ch. 244, 163 A.2d 288 (1960).

Having concluded on the basis of the number of votes authorized by the shares of the corporate respondent's authorized and outstanding stock as of 5 p. m. on December 23, 1975 that insufficient valid votes for the election of applicants' slate of directors were obtained by either the December 23, 1975 consent document or that of January 7, 1976, I do not reach the question of whether or not additional shares of Inverness Management Corporation issued to the respondent Garrick C. Stephenson after 5 p. m. on December 23, 1975 were issued for an improper purpose.

■ Finally, I decline to direct that an election of directors of Inverness Management Corporation be now held under Court order, as prayed for by applicants. The board which was elected in June 1975 at the last annual meeting of stockholders of the corporate respondent will, of course, remain in office for the present as the duly constituted board of directors of Inverness Management Corporation. It would be unwarranted judicial interference in intra-corporate affairs, in my opinion, to order an election now. See 8 Del.C. § 211.

Order on notice.