Leonard I. SCHREIBER, Plaintiff,

v.

Robert J. CARNEY, Robert Garrett, I. H. Handmaker, A. Thomas Hickey, Francisco A. Lorenzo, Carl R. Pohlad, Howard P. Swanson, James W. Wilson, Jet Capital Corporation, and Texas International Airlines, Inc., Defendants.

Court of Chancery of Delaware, New Castle County.

Submitted Jan. 29, 1982.

Decided May 11, 1982.

Victor F. Battaglia, Biggs & Battaglia, Wilmington, and Pincus, Ohrenstein, Bizar, D'Alessandro & Solomon, New York City, for plaintiff.

Rodman Ward, Jr., Skadden, Arps, Slate, Meagher & Flom, Wilmington, and Brian Sullivan, Dykema, Gossett, Spencer, Goednow & Trigg, Detroit, Mich., for defendants-Garrett, Hickey, Pohlad and Swanson.

A. Gilchrist Sparks, III, Morris, Nichols, Arsht & Tunnell, Wilmington, and George A. Davidson, and David W. Wiltenburg, Hughes, Hubbard & Reed, New York City, for defendants-Carney, Lorenzo, Wilson and Jet Capital Corp.

Jack B. Jacobs, Young, Conaway, Stargatt & Taylor, Wilmington, for defendant-Texas Intern. Airlines, Inc.

HARTNETT, Vice Chancellor.

In this stockholder's derivative action, Leonard I. Schreiber, the plaintiff, brought suit on behalf of defendant—Texas International Airlines, Inc. ("Texas International"), a Delaware corporation, challenging the propriety of a loan from Texas International to defendant—Jet Capital Corporation ("Jet Capital"), the holder of 35% of the shares of stock of Texas International. Also joined as individual defendants were Texas International's board of directors—several of whom also served on Jet Capital's board of directors. The matter is presently before the Court on cross-motions for summary judgment. Defendants' motion is based on their contention that there has been no showing of waste and that plaintiff lacks standing to bring this suit. Plaintiff's motion is based on his contention that the transaction was tainted by vote-buying and is therefore void. For the reasons set forth below, both motions must be denied.

I

The essential facts are undisputed. The lawsuit arises out of the corporate restructuring of Texas International which occurred on June 11, 1980. The restructuring was accomplished by way of a share for share merger between Texas International and Texas Air Corporation ("Texas Air"), a holding company formed for the purpose of effectuating the proposed reorganization. Texas Air is also a Delaware corporation. At the annual meeting held on June 11,

1980 the shareholders voted overwhelmingly in favor of the proposal. As a result the shareholders of Texas International were eliminated as such and received in trade for their stock an equal number of shares in Texas Air. Texas International in turn became a wholly-owned subsidiary of Texas Air.

Prior to the merger Texas International was engaged in the airline business servicing the cities of Houston and Dallas, Texas. All concede that the purpose of the merger was to enable Texas International—under a new corporate structure—to diversify, to strengthen itself financially and in general to be transformed into a more viable and aggressive enterprise. According to the proxy statement issued in connection with the merger, management indicated that although there were no commitments at that time, it was actively considering the possibility of acquiring other companies engaged in both related as well as unrelated fields.

During the formulation of the reorganization plan, management was confronted with an obstacle, the resolution of which forms the basis for this lawsuit, because Jet Capital, the owner of the largest block of Texas International's stock, threatened to block the merger. Jet Capital's veto power resulted from a provision in Texas International's Certificate of Incorporation which required that each of its four classes of stock participate in the approval of a merger. At that time, Texas International's four classes of outstanding stock consisted of 4,669,182 shares of common stock and three series of convertible preferred stock; 32,318 shares of Series A stock, 66,075 shares of Series B stock and 2,040,000 shares of Series C stock. According to the Certificate of Incorporation a majority vote was required of both the common stockholders and the Series A preferred stockholders voting as separate classes. Similarly, a majority vote was required of the Series B and Series C preferred stockholders, but voting together as a single class. Because Jet Capital owned all of the Series C preferred stock—the larger class—it was in a position to block the merger proposal. Jet Capital indicated that although the proposal was indeed beneficial to Texas International and the other shareholders, it was nevertheless compelled to vote against it because the merger, if approved, would impose an intolerable income tax burden on it. This was so because the merger had an adverse impact on Jet Capital's position as the holder of certain warrants to purchase Texas International's common stock which would expire in 1982. There were warrants outstanding for the purchase of 1,029,531 shares of Texas International common stock at $4.18 per share and, of these, Jet Capital owned sufficient warrants to acquire 799,880 shares of Texas International's common shares. As the holder of these warrants, Jet Capital was faced with three alternatives.

The first alternative for Jet Capital was for it to participate in the merger and exchange its Texas International warrants for Texas Air warrants. However, according to an Internal Revenue Service ruling obtained by management, each holder of an unexercised Texas International warrant would be deemed to have realized taxable income from the merger as if the warrant had been exercised. Thus, it was estimated that Jet Capital would incur an $800,000 federal income tax liability. Because Jet Capital was a publicly held company, its management could not justify the assumption of such a tax liability and, therefore, did not consider this a viable alternative.

The second alternative was for Jet Capital to exercise the warrants prematurely. The merger would then be tax free to it as it would be to the other shareholders. This, however, was also not deemed to be feasible because Jet Capital lacked the approximately three million dollars necessary to exercise the warrants. Jet Capital's assets—other than its Texas International stock—were worth only $200,000. In addition, borrowing money at the prevailing interest rates in order to finance an early exercise of the warrants was deemed prohibitively expensive by the management of Jet Capital. In any event, this alternative was considered to be imprudent because the early exercise of the warrants posed an unnecessary mar-

ket risk because the market value of Texas International's stock on the date of the early exercise might prove to be higher than that on the expiration date. As a result, this alternative was also not considered viable.

The third and final alternative was for Jet Capital to vote against the merger and thus preclude it. Given these alternatives, Jet Capital obviously chose to oppose the restructuring.

In order to overcome this impasse, it was proposed that Texas International and Jet Capital explore the possibility of a loan by Texas International to Jet Capital in order to fund an early exercise of the warrants. Because Texas International and Jet Capital had several common directors, the defendants recognized the conflict of interest and endeavored to find a way to remove any taint or appearance of impropriety. It was, therefore, decided that a special independent committee would be formed to consider and resolve the matter. The three Texas International directors who had no interest in or connection with Jet Capital were chosen to head up the committee. After its formation, the committee's first act was to hire independent counsel. Next, the committee examined the proposed merger and, based upon advice rendered by an independent investment banker, the merger was again found to be both a prudent and feasible business decision. The committee then confronted the "Jet Capital obstacle" by considering viable options for both Texas International and Jet Capital and, as a result, the committee determined that a loan was the best solution.

After negotiating at arm's length, both Texas International and Jet Capital agreed that Texas International would loan to Jet Capital $3,335,000 at 5% interest per annum for the period up to the scheduled 1982 expiration date for the warrants. After this period, the interest rate would equal the then prevailing prime interest rate. The 5% interest rate was recommended by an independent investment banker as the rate necessary to reimburse Texas International for any dividends paid out during this

period. Given this provision for anticipated dividends and the fact that the advanced money would be immediately paid back to Texas International upon the exercise of the warrants, the loan transaction had virtually no impact on Texas International's cash position.

As security Jet Capital was required to pledge all of its Series C preferred stock having a market value of approximately 150% of the amount of the loan. In addition, Jet Capital was expected to apply to the prepayment of the loan any after tax proceeds received from the sale of any stock acquired by Jet Capital as a result of the exercise of the 1982 warrants.

The directors of Texas International unanimously approved the proposal as recommended by the committee and submitted it to the stockholders for approval—requiring as a condition of approval that a majority of all outstanding shares *and* a majority of the shares voted by the stockholders other than Jet Capital or its officers or directors be voted in favor of the proposal. After receiving a detailed proxy statement, the shareholders voted overwhelmingly in favor of the proposal. There is no allegation that the proxy statement did not fully disclose all the germane facts with complete candor.

The complaint attacks the loan transaction on two theories. First, it is alleged that the loan transaction constituted vote-buying and was therefore void. Secondly, the complaint asserts that the loan was corporate waste. In essence, plaintiff argues that even if the loan was permissible and even if it was the best available option, it would have been wiser for Texas International to have loaned Jet Capital only $800,-000—the amount of the increased tax liability—because this would have minimized Texas International's capital commitment and also would have prevented Jet Capital from increasing its control in Texas International on allegedly discriminatory and wasteful terms. Plaintiff also points out that the 5% interest rate on the loan was only equal to the amount of dividends Texas International would have been expected

to pay during the period between the time of the early exercise and the date the warrants expired. Jet Capital, therefore in effect it is urged, received an interest free loan for the nearly two-year period preceding the 1982 warrant expiration date.

## II

In support of their motion for summary judgment, defendants contend that plaintiff lacks standing to maintain a derivative suit on behalf of Texas International because he was not a stockholder at the time this suit was filed. As a result of the reorganization merger plaintiff's stock holdings in Texas International were converted into shares of Texas Air and the merger occurred prior to the filing of the complaint. Defendants also contend that they are entitled to summary judgment because they assert the record fails to establish any factual basis to support a claim of corporate waste.

In reply and in support of his motion for summary judgment, plaintiff contends that the loan constituted vote-buying and therefore the entire merger transaction was void and his standing to maintain a derivative suit on behalf of Texas International is therefore preserved. These contentions regarding standing, vote-buying and corporate waste will be discussed *seriatim*.

## III

First to be considered is defendants' assertion that plaintiff does not have standing to bring this suit.

■ As required by 8 *Del.C.* § 327 a plaintiff who brings a derivative suit on behalf of a corporation must be a stockholder of the corporation at the time he commences the suit.[1] This suit was brought after plaintiff's shares in Texas International were converted into shares in Texas Air by the merger and it is clear that a merger which eliminates a complaining

stockholder's ownership of stock in a corporation also ordinarily eliminates his status to bring or maintain a derivative suit on behalf of the corporation, whether the merger takes place before or after the suit is brought, on the theory that upon the merger the derivative rights pass to the surviving corporation which then has the sole right or standing to prosecute the action. *Bokat v. Getty Oil Co.*, Del.Supr., 262 A.2d 246 (1970); *Weinberger v. UOP, Inc.*, Del.Ch., 426 A.2d 1333 (1981); *Hutchison v. Bernhard*, Del.Ch., 220 A.2d 782 (1965); *Braasch v. Goldschmidt*, Del.Ch., 199 A.2d 760 (1964); *Heit v. Tenneco, Inc.*, D.Del., 319 F.Supp. 884 (1970). This rule, however, is not without exception.

In *Helfand v. Gambee*, Del.Ch., 136 A.2d 558 (1957), a corporate reorganization occurred in response to an antitrust consent decree whereby the shareholders of the existing corporation received shares of a newly organized corporation. Vice Chancellor Marvel permitted the plaintiff to maintain his derivative suit on behalf of the new corporation despite the fact that the complaint sought relief for acts which allegedly occurred during the existence of the old corporation and despite the fact that the complaining stockholder voted *in favor of* the merger. Standing to sue was granted because it was held that the sole purpose of 8 *Del.C.* § 327 was to prevent the evil of the purchasing of shares for the purpose of bringing a derivative action based on transactions antedating the purchase and because the plaintiff merely held "two pieces of paper rather than one" as evidence of her long investment in the corporation and its new alter ego. 136 A.2d 562. The Court focused on the involuntary nature of the transaction, in that it was pursuant to a consent decree, as well as considering the purpose for the enactment of 8 *Del.C.* § 327.

---

1. 8 *Del.C.* § 327 states:
  "§ 327. *Stockholder's derivative action; allegation of stock ownership.*
  In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which he complains or that his stock thereafter devolved upon him by operation of law."
  Rule 23.1 contains the same provision.

In considering the statutory intent of section 327, the Court relied upon *Rosenthal v. Burry Biscuit Corporation*, 60 A.2d 106, 111 (Del.Ch.1948), in which Chancellor Seitz concluded that the sole purpose of section 327 was "to prevent what has been considered an evil, namely, the purchasing of shares in order to maintain a derivative action designed to attack a transaction which occurred prior to the purchase of the stock." Chancellor Seitz also stated that "rigidity is not needed where the equitable owner of stock is seeking to protect the corporate interests." 60 A.2d 112. See also *Bokat v. Getty Oil Co.*, Del.Supr., 262 A.2d 246, 250 (1970). Thus, it is clear that the provisions of 8 *Del.C.* § 327 are not inflexible standards and this Court, as a Court of Equity, must examine carefully the particular circumstances of each case.

In the present case the merger pursuant to the plan of reorganization is quite similar to the reorganization in *Helfand*. The reorganization now before the Court is merely a share for share merger with a newly formed holding company, which retained the old company as a wholly-owned subsidiary of the new holding company with the shareholders of the old company owning all the shares of the new holding company. The structure of the old and new companies is virtually identical except for a slight dilution in the overall stock holdings occasioned by Jet Capital's exercise of its warrants. Just as in *Helfand*, plaintiff brought this derivative suit after a reorganization, challenging acts which occurred prior to the reorganization when plaintiff was a shareholder. Although in *Helfand*, unlike here, the old company was dissolved and suit was maintained on behalf of the new company, the analogy between *Helfand* and this case is still valid because plaintiff in the present case possesses the same equitable derivative standing as did the plaintiff in *Helfand*. And the instant action is really a double derivative suit. 13 Fletcher, *Cyclopedia Corporations* (Perm.Ed.) § 5977. Plaintiff's position is involuntary insofar as he voted against the merger and his equity interest in the business entity is really still the same. To deny standing, therefore, would not serve to advance the stated purpose of section 327 and would open the door to great abuses. Because the merger had no meaningful effect on the plaintiff's ownership of the business enterprise, he should have standing to maintain a derivative suit to correct an alleged breach of fiduciary duty. This is evident when the structure of the two corporations is examined because they are virtually identical. In essence, plaintiff still possesses an equitable right to sue derivatively for the benefit of Texas International's interests as they exist after the reorganization.

Several Delaware cases have denied standing to maintain a stockholder's derivative suit after a merger. *Bokat v. Getty Oil Co.*, supra; *Weinberger v. UOP, Inc.*, supra; *Hutchison v. Bernhard*, supra, and *Braasch v. Goldschmidt*, supra. In those cases, however, the mergers were either cash-out mergers or mergers with outside or pre-existing corporations with substantial assets.

In *Heit v. Tenneco, Inc.*, D.Del., 319 F.Supp. 884 (1970), a case which is, of course, not binding on this Court, the facts were quite different from the facts in the present case because a mere facelifting reorganization was not involved and the plaintiff had a remedy: to attempt to enjoin the merger which occurred during the course of the litigation. And the ruling in *Helfand* was neither cited nor discussed by the District Court. I am therefore not persuaded that the rule as set forth in *Heit* is controlling in the unusual factual circumstances of the present case and I find that plaintiff does have standing to maintain this suit.

## IV

Next to be considered is plaintiff's motion for summary judgment on the grounds that vote-buying existed and, therefore, the entire transaction including the merger was void because Jet Capital, in consideration for being extended an extremely advantageous loan, withdrew its opposition to the proposed merger. Thus, it is alleged that in substance and effect, Tex-

as International purchased Jet Capital's necessary vote in contravention of settled law and public policy. As a consequence, plaintiff urges that the less than unanimous shareholder consent was insufficient to ratify a void act and its illegality permeated the entire transaction rendering the merger itself void. The critical inquiry, therefore, is whether the loan in question was in fact vote-buying and, if so, whether vote-buying is illegal, *per se.*

It is clear that the loan constituted vote-buying as that term has been defined by the courts. Vote-buying, despite its negative connotation, is simply a voting agreement supported by consideration personal to the stockholder, whereby the stockholder divorces his discretionary voting power and votes as directed by the offeror. The record clearly indicates that Texas International purchased or "removed" the obstacle of Jet Capital's opposition. Indeed, this is tacitly conceded by the defendants. However, defendants contend that the analysis of the transaction should not end here because the legality of vote-buying depends on whether its object or purpose is to defraud or in some manner disenfranchise the other stockholders. Defendants contend that because the loan did not defraud or disenfranchise any group of shareholders, but rather enfranchised the other shareholders by giving them a determinative vote in the proposed merger, it is not illegal *per se.* Defendants, in effect, contend that vote-buying is not void *per se* because the end justified the means. Whether this is valid depends upon the status of the law.

The Delaware decisions dealing with vote-buying leave the question unanswered. See *Macht v. Merchants Mortgage & Credit Co.,* Del.Ch., 194 A. 19 (1937); *Hall v. Isaacs,* Del.Ch., 146 A.2d 602 (1958), aff'd, Del.Supr., 163 A.2d 288 (1960); and *Chew v. Inverness Mgt. Corp.,* Del.Ch., 352 A.2d 426 (1976). In each of these decisions, the Court summarily voided the challenged votes as being purchased and thus contrary to public policy and in fraud of the other stockholders. However, the facts in each case indicated that fraud or disenfranchisement was the obvious purpose of the vote-buying.

The seminal Delaware case, *Macht v. Merchants Mortgage & Credit Co.,* supra, involved a series of criminally manipulative transactions instigated by a designing director in order to wrest control of the corporation from the other stockholders for fraudulent motives. In that case the Court stated with respect to vote-buying:

"As to the 224 shares which Sigmund Ades, Harry Ades and Sylvia Ades Norinsky hold as a 'Protective Committee,' my conclusion is that they should not be permitted to vote. The deposit of these shares with the committee by the various holders was secured by paying out money to the depositing stockholders as an inducement to them to do so. The money was drawn from Home out of the assets formerly belonging to Merchants. It was I believe subsequently repaid to Home by Sigmund Ades, acting as the agent of his father, Harry Ades. In so far as the voting power of these shares is concerned, I think there can be no doubt that it was purchased. To allow voting rights that are bought to be exercised is against public policy, and would be in fraud of the other stockholders. *Dieckmann v. Robyn,* 162 Mo.App. 67, 141 S.W. 717; *Brady v. Bean,* 221 Ill.App. 279; *Smith v. San Francisco, etc., Co.,* 115 Cal. 584, 47 P. 582, 35 L.R.A. 309, 56 Am.St.Rep. 119." 194 A. 22.

Likewise in *Hall* and *Chew* the courts emphatically stated that vote-buying was against public policy but failed to discuss the reason why, other than because of the obvious presence of fraud.

The present case presents a peculiar factual setting in that the proposed vote-buying consideration was conditional upon the approval of a majority of the disinterested stockholders after a full disclosure to them of all pertinent facts and was purportedly for the best interests of all Texas International stockholders. It is therefore necessary to do more than merely consider the fact that Jet Capital saw fit to vote for the transaction after a loan was made to it by

Texas International. As stated in *Oceanic Exploration Co. v. Grynberg*, Del.Supr., 428 A.2d 1 (1981), a case involving an analogous situation, to do otherwise would be tantamount to "[d]eciding the case on ... an abstraction divorced from the facts of the case and the intent of the law." 428 A.2d 5.

A review of the present controversy, therefore, must go beyond a reading of *Macht v. Merchants Mortgage & Credit Co.*, supra, and consider the cases cited therein: *Dieckmann v. Robyn*, Mo.App., 162 Mo.App. 67, 141 S.W. 717 (1911); *Brady v. Bean*, 221 Ill. 279 (1921); *Smith v. San Francisco, etc.*, 115 Cal. 584, 47 P. 582 (1897); and *Cone v. Russell*, 48 N.J.Eq. 208, 21 A. 847 (1891). There are essentially two principles which appear in these cases. The first is that vote-buying is illegal *per se* if its object or purpose is to defraud or disenfranchise the other stockholders. A fraudulent purpose is as defined at common law, as a deceit which operates prejudicially upon the property rights of another.

The second principle which appears in these old cases is that vote-buying is illegal *per se* as a matter of public policy, the reason being that each stockholder should be entitled to rely upon the independent judgment of his fellow stockholders. Thus, the underlying basis for this latter principle is again fraud but as viewed from a sense of duty owed by all stockholders to one another. The apparent rationale is that by requiring each stockholder to exercise his individual judgment as to all matters presented, "[t]he security of the small stockholders is found in the natural disposition of each stockholder to promote the best interests of all, in order to promote his individual interests." *Cone v. Russell*, 48 N.J.Eq. 208, 21 A. 847, 849 (1891). In essence, while self interest motivates a stockholder's vote, theoretically, it is also advancing the interests of the other stockholders. Thus, any agreement entered into for personal gain, whereby a stockholder separates his voting right from his property right was considered a fraud upon this community of interests.

The often cited case of *Brady v. Bean*, 221 Ill.App. 279 (1921), is particularly enlightening. In that case, the plaintiff—an apparently influential stockholder—voiced his opposition to the corporation's proposed sale of assets. The plaintiff feared that his investment would be wiped out because the consideration for the sale appeared only sufficient enough to satisfy the corporation's creditors. As a result and without the knowledge of the other stockholders, the defendant, also a stockholder as well as a director and substantial creditor of the company, offered to the plaintiff in exchange for the withdrawal of his opposition, a sharing in defendant's claims against the corporation. In an action to enforce this contract against the defendant's estate, the Court refused relief stating:

> "Appellant being a stockholder in the company, any contract entered into by him whereby he was to receive a personal consideration in return for either his action or his inaction in a matter such as a sale of all the company's assets, involving, as it did, the interests of all the stockholders, was contrary to public policy and void, it being admitted that such contract was not known by or assented to by the other stockholders. *The purpose and effect of the contract was apparently to influence appellant, in his decision of a question affecting the rights and interests of his associate stockholders, by a consideration which was foreign to those rights and interests and would likely to induce him to disregard the consideration he owed them and the contract must, therefore, be regarded as a fraud upon them.* Such an agreement will not be enforced, as being against public policy. *Teich v. Kaufman*, 174 Ill.App. 306; *Guernsey v. Cook*, 120 Mass. 501; *UPalmbaum [Palmbaum] v. Magulsky*, 217 Mass. 306 [104 N.E. 746]." (emphasis added) 221 Ill.App. at 283.

In addition to the deceit obviously practiced upon the other stockholders, the Court was clearly concerned with the rights and interests of the other stockholders. Thus, the potential injury or prejudicial impact which might flow to other stockholders as a result

of such an agreement forms the heart of the rationale underlying the breach of public policy doctrine.

An automatic application of this rationale to the facts in the present case, however, would be to ignore an essential element of the transaction. The agreement in question was entered into primarily to further the interests of Texas International's other shareholders. Indeed, the shareholders, after reviewing a detailed proxy statement, voted overwhelmingly in favor of the loan agreement. Thus, the underlying rationale for the argument that vote-buying is illegal *per se*, as a matter of public policy, ceases to exist when measured against the undisputed reason for the transaction.

Moreover, the rationale that vote-buying is, as a matter of public policy, illegal *per se* is founded upon considerations of policy which are now outmoded as a necessary result of an evolving corporate environment. According to 5 Fletcher *Cyclopedia Corporation* (Perm.Ed.) § 2066:

"The theory that each stockholder is entitled to the personal judgment of each other stockholder expressed in his vote, and that any agreement among stockholders frustrating it was invalid, is obsolete because it is both impracticable and impossible of application to modern corporations with many widely scattered stockholders, and the courts have gradually abandoned it."

In addition, Delaware law has for quite some time permitted stockholders wide latitude in decisions affecting the restriction or transfer of voting rights. In *Ringling Bros., Etc., Shows, Inc. v. Ringling*, Del. Supr., 53 A.2d 441 (1947), the Delaware Supreme Court adopted a liberal approach to voting agreements which, prior to that time, were viewed with disfavor and were often considered void as a matter of public policy. In upholding a voting agreement the Court stated:

"Generally speaking, a shareholder may exercise wide liberality of judgment in the matter of voting, and it is not objectionable that his motives may be for personal profit, or determined by whims or caprice, so long as he violates no duty owed his fellow stockholders." (citation omitted)

The Court's rationale was later codified in 8 *Del.C.* § 218(c), which states:

"(c) An agreement between 2 or more stockholders, if in writing and signed by the parties thereto, may provide that in exercising any voting rights, the shares held by them shall be voted as provided by the agreement, or as the parties may agree, or as determined in accordance with a procedure agreed upon by them. No such agreement shall be effective for a term of more than 10 years, but, at any time within 2 years prior to the time of the expiration of such agreement, the parties may extend its duration for as many additional periods, each not to exceed 10 years, as they may desire."

Recently, in *Oceanic Exploration Co. v. Grynberg*, Del.Supr., 428 A.2d 1 (1981), the Delaware Supreme Court applied this approach to voting trusts. The Court also indicated, with approval, the liberal approach to all contractual arrangements limiting the incidents of stock ownership. Significantly, *Oceanic* involved the giving up of voting rights in exchange for personal gain. There, the stockholder, by way of a voting trust, gave up his right to vote on all corporate matters over a period of years in return for "valuable benefits including indemnity for large liabilities." 428 A.2d at 5.

Given the holdings in *Ringling* and *Oceanic* it is clear that Delaware has discarded the presumptions against voting agreements. Thus, under our present law, an agreement involving the transfer of stock voting rights without the transfer of ownership is not necessarily illegal and each arrangement must be examined in light of its object or purpose. To hold otherwise would be to exalt form over substance. As indicated in *Oceanic* more than the mere form of an agreement relating to voting must be considered and voting agreements in whatever form, therefore, should not be considered to be illegal *per se* unless the object or purpose is to defraud or in some

way disenfranchise the other stockholders. This is not to say, however, that vote-buying accomplished for some laudible purpose is automatically free from challenge. Because vote-buying is so easily susceptible of abuse it must be viewed as a voidable transaction subject to a test for intrinsic fairness.

## V

■ Apparently anticipating this finding, plaintiff also attempts to cast the loan agreement as one seeking to accomplish a fraudulent purpose. As indicative of fraud, plaintiff points to the fact that no other warrant holder was given a similar loan to enable an early exercise of the warrants. However, despite this contention, I am satisfied that, based on the record, there is no evidence from which an inference of a fraudulent object or purpose can be drawn.

As to the other warrant holders who did not get a loan, they were merely the holders of an expectant and contingent interest and, as such, were owed no duty by Texas International except as set forth in the warrant certificates. FOLK, *The Delaware General Corporation Law*, Little, Brown (1972) § 155, p. 126. In any event, the record fails to show any evidence that Texas International's ultimate decision to fund Jet Capital's early exercise of the warrants was motivated and accomplished except with the best interests of all Texas International stockholders in mind.

## VI

■ I therefore hold that the agreement, whereby Jet Capital withdrew its opposition to the proposed merger in exchange for a loan to fund the early exercise of its warrants was not void *per se* because the object and purpose of the agreement was not to defraud or disenfranchise the other stockholders but rather was for the purpose of furthering the interest of all Texas International stockholders. The agreement, however, was a voidable act. Because the loan agreement was voidable it was susceptible to cure by shareholder approval. *Michelson v. Duncan*, Del.Supr., 407 A.2d 211 (1979).

Consequently, the subsequent ratification of the transaction by a majority of the independent stockholders, after a full disclosure of all germane facts with complete candor precludes any further judicial inquiry of it.

## VII

Lastly, I consider defendants' motion for summary judgment based on the allegation that the record fails to show any factual basis to support an allegation of corporate waste.

■ It is well settled in this state that waste of corporate assets is incapable of ratification without unanimous stockholder consent. *Beard v. Elster*, Del.Supr., 160 A.2d 731 (1960); *Kerbs v. California Eastern Airways*, Del.Supr., 90 A.2d 652 (1952); *Gottlieb v. Heyden Chemical Corp.*, Del. Supr., 91 A.2d 57 (1952); *Saxe v. Brady*, Del.Ch., 184 A.2d 602 (1962); and *Michelson v. Duncan*, Del.Supr., 407 A.2d 211 (1979). These decisions, however, also hold that in an action challenging a transaction on grounds of corporate waste which is subsequently ratified by the stockholders, the burden of persuasion falls on the objecting stockholder "to convince the Court that no person of ordinary, sound business judgment would be expected to entertain the view that the consideration was a fair exchange for the value which was given" (citations omitted). *Saxe v. Brady*, 184 A.2d at 610. Because the present transaction was both approved by a disinterested committee of directors and ratified by a majority of the stockholders including a majority of the disinterested stockholders, plaintiff clearly carries the burden of persuasion as to this issue. *Michelson v. Duncan*, supra.

■ While defendants have compiled a strong record negating a claim of waste, plaintiff has only relied on his contention that the 5% interest rate on the loan from Texas International to Jet Capital constituted waste. Specifically, plaintiff claims that, because the 5% interest rate was merely equal to the dividends anticipated to be paid on the stock during the time period the warrants would have been outstanding

if the early exercise of the warrants had not occurred, Jet Capital received a virtually interest free loan from the time of the exercise of the warrants until the original expiration date. Moreover, plaintiff contends that the loan was given to a controlling stockholder whose net worth precluded it from securing such financing elsewhere. As a result, this controlling stockholder was able to increase its holdings in Texas International at the expense of that company.

On the other hand, defendants contend that the terms of the loan were properly within the realm of business judgment and the consideration which flowed to Texas International from the merger was invaluable. In essence, defendants contend that the merger permitted: expansion, diversification, increased efficiency, reductions in costs and minimized governmental regulation. In addition, as earlier indicated, the loan is claimed to have had a minimal impact on Texas International's cash position because the money was immediately paid back into the company upon the exercise of the warrants. Moreover, it is urged that because the 5% interest rate was equal to the dividends which would have been paid, this further reduced the impact on Texas International's cash position and is therefore viewed by defendants as a positive factor.

Nevertheless, although plaintiff's claim of waste is barely supported by the record, I am reluctant to grant summary judgment on a question of corporate waste without giving plaintiff an opportunity to further develop his claim. In *Michelson v. Duncan*, supra, a decision in which the plaintiffs did nothing more than put the defendants on notice of a challenge based on corporate waste, the Delaware Supreme Court held:

> "Claims of gift or waste of corporate assets are seldom subject to disposition by summary judgment; and when there are genuine issues of fact as to the existence of consideration, a full hearing is required

regardless of shareholder ratification. See *Kerbs v. California Eastern Airways*, supra; *Gottlieb v. Heyden Chemical Corp.*, supra. 'The determination of whether or not there has been in any given situation a gift of corporate assets does not rest upon any hard and fast rule. It is largely a question of fact.' *Gottlieb v. McKee*, Del.Ch., 34 Del.Ch. 537, 107 A.2d 240 at 243 (1954). In *Saxe v. Brady*, Del.Ch., 40 Del.Ch. 474, 184 A.2d 602 (1962), Chancellor Seitz stated 'Where waste of corporate assets is alleged, the court, notwithstanding independent stockholder ratification, must examine the facts of the situation.' (184 A.2d at 610). In *Heyden* this Court stated:

> "An important question, which is not yet answered, is whether these services and these options can sensibly be deemed to be the subject of a fair exchange. This is obviously not a mere question of law. An issue of fact is raised, as to which, as yet, no evidence has been taken." 33 Del.Ch. 177, 91 A.2d 57 at 59'."

In view of this holding, I cannot conclude, at this time, that as a matter of law there was no waste of corporate assets.

### VIII

In summary plaintiff's motion for summary judgment on the grounds that the transaction before the Court was permeated by vote-buying and was therefore void or voidable is denied. Defendants' motion for summary judgment on the grounds that plaintiff lacks standing to bring this suit or on the grounds that there is no factual basis for a claim of waste is denied.

IT IS SO ORDERED.