COMMONWEALTH ASSOCIATES, Kerry Joseph Dukes, John Robinson, Frederick Prunier, and James E. Brands, Plaintiffs,

v.

PROVIDENCE HEALTH CARE, INC., Lawrence B. Cummings, Harvey Wershbale, Thomas W. Janes, Brian A. Lingard, and Jugal K. Taneja, Defendants.

C.A. No. 13214.

Court of Chancery of Delaware, New Castle County.

Date Submitted: Dec. 2, 1993.

Date Decided: Dec. 7, 1993.

Stephen E. Jenkins, Richard D. Heins, and Christopher S. Sontchi, Ashby & Geddes, Wilmington, (Robert W. Forman, Greenberger & Forman, New York City, of counsel), for plaintiffs.

Lawrence A. Hamermesh, and Seth D. Rigrodsky, Morris, Nichols, Arsht & Tunnell, Wilmington, (Freeborn & Peters, Chicago, IL, of counsel), for defendants.

## OPINION

ALLEN, Chancellor.

In this action under Section 225 of the Delaware General Corporation Law the ultimate question is who are the validly designated directors of Providence Health Care, Inc., a Delaware corporation. That question is raised by the conclusion of a consent solicitation under Section 228 of the General Corporation Law. In that consent solicitation Commonwealth Associates sought to remove the directors of Providence from office and to replace them with the four individuals who are plaintiffs in this action. The critical issue in that connection is who had authority to consent or revoke consent with respect to 118,500 shares of Providence common stock beneficially owned, as of the record date of the consent solicitation, by American Heritage Fund, Inc. It is agreed that if those shares effectively consented to the removal action at the close of the solicitation then Commonwealth prevailed, but that it failed if those shares did not effectively consent, or if consent was validly revoked as of that time.[1]

I.

The case has been tried. The facts set forth below constitute my findings of fact based upon a preponderance of the relevant admissible evidence.

The critical 118,500 shares are held of record by Cede & Co., the nominee for Depository Trust Company ("DTC"). It is undisputed that as of the record date (August 27, 1993) DTC held these shares for the

---

1. This action follows on another action with respect to this consent solicitation. *See Commonwealth Assoc. v. Providence Health Care, Inc.*, C.A. No. 13135, 1993 WL 432779, Allen, C. (Oct. 22, 1993) (granting preliminary injunction restraining Providence from treating as validly issued and outstanding a newly issued 20% block of its stock held by a corporation that was 40% owned by Providence).

account of Bank of New York ("BoNY") which in turn held them as custodian for National State Bank, now known as Constellation Bank ("Constellation"). Constellation held the stock under a custodian arrangement for American Heritage, the beneficial owner as of the record date.

On September 15, in the midst of the contested consent solicitation, American Heritage sold a block of 50,000 shares of its Providence common stock through John Bendall, a broker at Hermitage Capital Corp. On September 27, American Heritage sold a second block of Providence shares, this time 68,500 shares, again through Mr. Bendall. In both instances Mr. Bendall was acting for the account of Mr. Lawrence Cummings, a major shareholder and CEO of Providence. These sales left American Heritage with beneficial ownership of approximately 18,000 shares.

It appears to be agreed that Cede & Co. granted an omnibus proxy to BoNY to vote all (134,500) shares of Providence registered in Cede's name and held for the account of BoNY. It is undisputed that on September 29th BoNY granted a written proxy to Lawrence Cummings "to take action without a stockholder's meeting" and "with a record date of August 27, 1993." That proxy was stated to be irrevocable and "limited to 118,-500 shares." [2]

On October 25, 1993, Lawrence Cummings delivered a copy of the BoNY proxy together with a revocation of consent with respect to 118,500 shares to Amory Cummings, the Secretary of Providence Health Care. On the basis of the purchase, the irrevocable proxy and the delivery of the revocation, defendants argue that the consent solicitation failed.

Plaintiffs' account is more complicated and raises a number of issues I need not decide. In all events, it is premised on the assertion that when American Heritage sold the 118,-

500 Providence shares through Mr. Bendall it, nevertheless, retained the right to vote those shares as of the August 27 record date. Mr. Heiko Thieme, the managing officer of American Heritage, asserts that this was a valuable right that he would only have transferred for additional consideration. The contention that any such right was reserved is warmly contested by Mr. Bendall, who testifies that Mr. Thieme agreed to Bendall's request for a proxy, and that the circumstances of the sale and the premium over market that was paid is deeply inconsistent with Mr. Thieme's account.

In all events, it appears that on October 19, several weeks after the later of the two sales and towards the end of the 60 day period during which the consent solicitation could go forward (*see* 8 *Del.C.* § 228(c)), William Burke, an officer of Commonwealth, sought from Mr. Thieme the execution of a consent card for Commonwealth with respect to all 134,500 shares that were registered in Cede's name on Commonwealth's books as of the record date. Mr. Thieme, on advice of his counsel, got Commonwealth to indemnify him for costs and liabilities that might arise from that act and, being offered such indemnification, signed the consent. An additional consent was signed on October 26 in an effort, I surmise, to react to the delivery of Mr. Cummings' revocation and irrevocable proxy.[3]

## II.

■ For the reasons that follow I conclude that Mr. Cummings' revocation was effective and that, therefore, the consent solicitation failed to garner the support at the effective time of a sufficient number of shares to take action to replace the board. First, I reject the contention that timely delivery to the corporation's secretary does not satisfy the requirements of Section 228(a) for delivery.[4]

2. There is a dispute whether BoNY had earlier granted an omnibus proxy and if so to whom. No one contends any such proxy was irrevocable. In all events, no such proxy has been discovered. Given the view I take of the evidence I need not attempt to answer the factual question whether any such proxy was ever given or the legal issues that it might implicate.

3. For the reasons discussed below, I have concluded that neither of these consents had any legal effect.

4. That section provides, in part, that consensus in writing:
   shall be delivered to the corporation by delivery to its registered office in this State, its

Absent proof of to the contrary, it is to be assumed that the Secretary is "an officer or agent ... having custody of the book in which proceedings of meetings of stockholders are recorded." Moreover, while technical matters of procedure serve useful purposes and demand our respect, the court should hesitate to deploy ambiguity in the record against the effective exercise of voting rights.

■ The more basic challenge that plaintiffs make upon Mr. Cummings' revocation is that he purchased no right to vote the stock with respect to the consent solicitation with its August 27 record date. This argument itself is a premise for a further argument: that the BoNY irrevocable proxy to Mr. Cummings was fraudulently induced because BoNY was told that Mr. Cummings *had* purchased the stock and *had a right to the proxy* for the past record date. American Heritage (via Mr. Thieme), claiming that such a statement was untrue, asserts that it was entitled to a BoNY proxy with respect to the August 27 record date, and that the BoNY irrevocable proxy that was granted to Cummings should be regarded as ineffective in this proceeding.

Plaintiffs concede that if it is concluded that Mr. Thieme did not reserve the right to vote the stock that was sold, explicitly or implicitly, then there was no fraud in the procurement of the irrevocable proxy from BoNY. Since I do indeed conclude that Mr. Thieme did *not* reserve any such right, explicitly or implicitly, in the sale of 118,500 shares of Providence stock through Mr. Bendall, I conclude there was no deception in inducing BoNY to grant a valid proxy.

> principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded....
> 8 *Del.C.* § 228(a).

5. I put aside cases in which the seller has not been paid and retains a security interest which would support the granting of an irrevocable proxy.

6. See *Chew v. Inverness Management Corp.*, Del. Ch., 352 A.2d 426, 430 (1976) (invalidating irrevocable consents obtained through acquisition of options to purchase shares); *Hall v. John S. Isaacs & Sons Farms*, Del.Ch., 146 A.2d 602, 613

## III.

The facts of this case raise an interesting question. Should the corporate law recognize a right to vote stock, with respect to a past but still relevant record date, once one has fully transferred all other incidents of ownership of the stock in question? To do so would give rise to the possibility of mischief of the same type as would be presented by the sale of votes unconnected to shares. The law has long discouraged the sale of votes unconnected to the sale of stock. *See* Robert C. Clark, *Corporate Law* § 9.5 (1985); David A. Drexler, et al., *Delaware Corporation Law and Practice* § 26–08 (1993). In part this may be because such sales misalign the interests of voters and the interests of the residual corporate risk bearers. *See* Frank H. Easterbrook & Daniel R. Fischel, *The Economic Structure of Corporate Law,* 74–75 (1991). The misalignment is extreme in a case in which a post-record date sale of stock occurs. Assuming a closed sale with respect to the stock sold, the record date owner no longer has any economic interest in the corporation as a shareholder.[5] What is such a person to do with this vote in a world that makes the frank sale of it illicit? [6]

The right to vote is fundamentally different from the right to collect dividends as of a record date. A dividend, of course, is cash or property, and the right to receive it is not tied up with the prospective operation of the corporation. A vote, on the other hand, is a mechanism designed to decide questions of governance *bearing on the future of the firm.* Sales of stock after the record date are not legally analogous to sales of stock *ex* dividend.

(1958) ("Shareholder votes may not be purchased for any consideration personal to the stockholder...."); *Macht v. Merchants Mortgage & Credit Co.*, Del.Ch., 194 A. 19, 22 (1937) ("To allow voting rights that are bought to be exercised is against public policy, and would be a fraud of the other stockholders."); *but see Schreiber v. Carney*, Del.Ch., 447 A.2d 17, 22–26 (1982) (noting that vote-buying is not void *per se*, but rather, "[b]ecause vote-buying is so easily susceptible of abuse it must be viewed as a voidable transaction subject to a test for intrinsic fairness").

These considerations lead me to doubt whether, in a post record-date sale of corporate stock, a negotiated provision in which a beneficial owner/seller specifically retained the "dangling" right to vote as of the record date, would be a legal, valid and enforceable provision, unless the seller maintained an interest sufficient to support the granting of an irrevocable proxy with respect to the shares.[7] But I need not express a final opinion on that subject because I conclude that Mr. Thieme did not attempt to include such a provision in this sale and that a reasonable negotiator in the circumstances of Mr. Bendall would have understood the terms of the sale to include the transfer of all of American Heritages' right, title and interest in the shares.[8] That is, I accept as truthful the testimony of Mr. Bendall and reject the testimony of Mr. Thieme. It is almost incredible in the circumstances of these purchases, in the heat of a consent solicitation battle, that Mr. Bendall would have purchased the stock without his vendor agreeing to cooperate in the exercise of the voting rights that supplied the entire reason for the purchase. At most one might suppose that nothing about the matter was said, Mr. Bendall assuming he acquired all of American Heritage's rights and Mr. Thieme not caring or thinking about the point at the time. But even if that were the case, I think the legally presumed implication, in a sale of the underlying stock, would be that the seller is contracting to sell and assign all of its rights, title and interest in the stock, including its right to grant a consent or a revocation with respect to a past record date, and that upon request the seller will, in good faith, take such ministerial steps as are necessary (e.g., granting proxies) to effectuate that transfer. *In re Giant Portland Cement Co.*, Del.Ch., 21 A.2d 697, 701–02 (1941); *In re Canal Construction Co.*, Del.Ch., 182 A. 545, 548 (1936). *See* Richard Maidman, *Voting Rights of After–Record–Date Shareholders: A Skeleton in a Wall Street Closet*, 71 Yale L.J. 1205 (1962) (contending that after record-date shareholders may compel issuance of proxy to vote shares). The bench ruling that plaintiffs cite *Sharon Steel Corp. v. Depository Trust Co.*, N.Y.Supr., Fraiman, J. (Mar. 22, 1979) is not to my mind persuasive. *See Flagg–Utica Corp. v. Baselice*, 14 Misc.2d 476, 178 N.Y.S.2d 860, 866–67 (1958).

This holding, of course, does not purport to recognize any obligation on the part of the corporation to recognize the rights of a post-record date acquiror who has for some reason failed to obtain a proxy to which it may be entitled. *See Giant Portland Cement Co.*, 21 A.2d 697 at 701; *Williams v. Sterling Oil Co. of Oklahoma, Inc.*, Del.Supr., 273 A.2d 264 (1971). That is another question.

In all events, I conclude that Mr. Cummings acquired all of American Heritage's right, title and interest in 118,500 shares of Providence stock, that BoNY was not deceived in granting him an irrevocable proxy for the shares (as it properly did) and that any consent that had been granted for those shares was properly and finally revoked by Mr. Cummings.

The complaint will therefore be dismissed with prejudice. Defendant may submit a form of order on notice.

---

7. Of course in the huge majority of cases the laws of beneficial voting power with respect to trades after the record date is not a problem. Absent the rarity of a proxy contest, as a practical matter, it does not matter very much whether the buyer or the seller directs the voting of the stock.

8. *Leeds v. First Allied Connecticut Corp.*, Del.Ch., 521 A.2d 1095 (1986) (objective legal test for the creation of contractual obligation); *Eustis Mining Co. v. Beer, Sondheimer & Co.*, 239 F. 976, 984 (S.D.N.Y.1917) (objective theory of contracts).