**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| DANIEL S. PEÑA, | ) | |
| | ) | |
| Petitioner / Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2023-0412-MTZ |
| | ) | |
| MACARTHUR GROUP, INC., | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THOMAS SAUER, COLIN MYERS, | ) | |
| WINTHROP MINOT, BRIAN | ) | |
| PICCIONI, MARIA MAST, and | ) | |
| JUSTIN O'NEIL, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Date Submitted: June 24, 2025
Date Decided: October 1, 2025

Benjamin P. Chapple, John T. Miraglia, REED SMITH LLP, Wilmington, Delaware, *Attorneys for Petitioner / Plaintiff Daniel S. Peña*.

Melissa N. Donimirski, Stacey A. Scrivani, STEVENS & LEE, P.C., Wilmington, Delaware, *Attorneys for Respondent and Defendants*.

**ZURN, Vice Chancellor.**

A corporation engaged in a stock-for-stock merger that effectively converted the corporation into a limited liability company. One stockholder dissented and sought appraisal. This case thus began as an appraisal proceeding. But appraisal discovery opened up a new chapter. Discovery revealed the company's CEO and controller, together with the CFO, had used company funds for personal reasons and caused the company to enter into a series of questionable transactions throughout the company's lifetime.

The case now involves direct claims for breach of fiduciary duty against the corporation's board. The plaintiff alleges the controller and the CFO, along with the rest of the board, disloyally orchestrated the merger to obtain a material nonratable benefit for themselves: reduced exposure to liability. The plaintiff's claims are both backward-looking and forward-looking. He alleges the merger insulates the board from liability for past conduct because it extinguished the corporate stockholders' derivative standing. He alleges the merger likewise insulates the board from liability for future conduct because, as permitted by the Delaware Limited Liability Company Act, the limited liability company eliminated fiduciary duties. The plaintiff also asserts a disclosure claim, alleging the corporation's board failed to disclose the merger's true purpose.

The defendants moved to dismiss. They contend that the merger did not confer a material nonratable benefit sufficient to trigger entire fairness review. I

1

conclude the plaintiff's forward-looking claim successfully pleads the merger conveyed a material nonratable benefit to the controller and the CFO. Entire fairness applies, and the plaintiff's breach of fiduciary duty claim survives the motion to dismiss as to those two defendants. I grant the motion as to the other defendants on the forward-looking claim, the backward-looking claim, and the disclosure claim.

## I.  BACKGROUND[1]

MacArthur Group, Inc. ("MacArthur" or the "Company") was a privately held Delaware corporation that operated residential treatment centers for veterans through its wholly owned subsidiary, Miramar Health, LLC ("Miramar"), a Delaware limited liability company.[2] Both MacArthur and Miramar were formed in April of 2019.[3]

---

[1] Unless otherwise noted, the following facts are drawn from the plaintiff's Verified Second Amended Petition and Complaint, available at Docket Item ("D.I.") 80 [hereinafter "Am. Compl."], as well as the documents attached and integral to it. *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004). Citations in the form of "OB __" refer to Defendant's Opening Brief in Support of Their Motion to Dismiss Counts II and III of the Verified Second Amended Petition and Complaint, available at D.I. 87. Citations in the form of "AB __" refer to Plaintiff's Answering Brief in Opposition to Defendants' Motion to Dismiss Counts II and III of the Verified Second Amended Petition and Complaint, available at D.I. 89. Citations in the form of "RB __" refer to Defendants' Reply Brief in Support of Their Motion to Dismiss Counts II and III of the Verified Second Amended Petition and Complaint, available at D.I. 94. Citations in the form of "Hr'g Tr. at __" refer to the transcript for the oral argument on Defendants' motion to dismiss, available at D.I. 96.

[2] Am. Compl. ¶¶ 28, 29.

[3] *Id.* ¶ 29.

Defendants Thomas Sauer, Colin Myers, Winthrop Minot, Brian Piccioni, Maria Mast, and Justin O'Neil (the "Defendants") were members of MacArthur's board of directors (the "Board").[4] Sauer was MacArthur's founder and CEO, as well as its largest stockholder, at all relevant times owning approximately 56.5% of MacArthur's outstanding stock.[5] Myers was MacArthur's CFO.[6]

### A.     Plaintiff Invests in MacArthur, Then Gets Diluted.

When Sauer was getting MacArthur off the ground, he enlisted the help of his former mentor, plaintiff Daniel S. Peña ("Plaintiff").[7] The two agreed Plaintiff would join the Company as Chairman of the Board and offer his "extensive business connections and acumen" in exchange for equity in MacArthur.[8] That agreement marked the beginning of the end.

When Plaintiff became a MacArthur stockholder in June of 2019, he was the Company's only non-director stockholder.[9] Plaintiff alleges that since the

---

[4] *Id.* ¶¶ 19–24.

[5] *Id.* ¶ 19.

[6] *Id.* ¶ 20.

[7] *Id.* ¶ 1.

[8] *Id.* ¶¶ 1, 31. It appears Plaintiff did not end up joining the MacArthur Board.

[9] *Id.* ¶ 5.  As of the Merger, MacArthur had nine stockholders, including Plaintiff.  Six of the stockholders sat on the MacArthur Board.  Two of the three non-director stockholders were recruited by Myers in August of 2019: one was a client of his family's wealth management firm and the other was the firm's Vice President.  Thus, Plaintiff alleges he was the "only non-director MacArthur stockholder who [was] truly an outsider." *Id.* ¶ 120.

3

Company's inception, he has been the target of a conspiracy in which Sauer, Myers, and Minot plotted to dilute Plaintiff's equity and voting power in the Company.[10]

## B. MacArthur Becomes A Limited Liability Company.

In July of 2022, Sauer, Myers, and Minot began exploring the possibility of a potential "conversion" for tax purposes.[11] At the same time, Defendants were considering a few other proposals, including a stock split, an equity incentive plan, and a dividend plan.[12] Defendants eventually pivoted toward a merger.[13]

On July 23, MacArthur's outside counsel notified the Company's stockholders that MacArthur would be postponing its annual stockholder meeting "to further investigate a board recommendation from a recent meeting." [14] Throughout the next six months, the Board sought legal advice from outside counsel on various governance matters.[15] These matters included "Delaware's exculpation provisions," "Peña investment," "stock agreements and corporate documents," "Mac[A]rthur corporate restructure," and "strategy . . . concerning

---

[10] *Id.* ¶¶ 32–53.

[11] *Id.* ¶ 104.

[12] *Id.* ¶¶ 105–06.

[13] *Id.* ¶ 107. The Amended Complaint does not plead when Defendants began to pursue the merger.

[14] D.I. 87 Ex. 3; Am. Compl. ¶ 108.

[15] Am. Compl. ¶ 109.

MacArthur/Miramar corporate identity."[16]  In August, Defendants met with outside counsel to discuss the legal ramifications of a conversion by merger (the "Merger"), "including with respect to the Board's potential exposure for pre-Merger fiduciary misconduct."[17]

The Board held a special meeting to discuss the Merger on December 14.[18] MacArthur's outside counsel delivered a presentation addressing "the legal issues, financial consequences and ramifications associated with the Merger."[19]  The Board then unanimously approved the draft terms and resolved to recommend the Merger to MacArthur's stockholders for their consideration.[20]

On or around January 6, 2023, MacArthur issued an Information Statement Regarding Proposed Merger of MacArthur Group, Inc. with and into MacArthur Group LLC (the "Information Statement").[21]  The Information Statement described the nature of the transaction, including the consideration that the MacArthur stockholders would receive: each share of MacArthur would be cancelled and converted into the right to receive one unit in MacArthur Group LLC ("Mac

---

[16] *Id.*

[17] *Id.*

[18] *Id.* ¶ 110.

[19] *Id.*

[20] *Id.*

[21] *See* D.I. 87 Ex. 2 [hereinafter "Information Statement"]; Am. Compl. ¶ 111.

LLC").[22]  The Information Statement advised the Board had "determined that the terms and conditions of the Merger are fair to, and in the best interests of, the stockholders [of MacArthur][.]"[23]  And it pointed to tax benefits as the primary rationale behind the Merger.[24]  Specifically, it explained:

> The decision of the [MacArthur] Board was based primarily on the benefits of [Mac LLC] being treated as a partnership for U.S. federal income tax purposes and generally not being subject to U.S. federal income tax; meaning generally there will no longer be a company level tax for future earnings of [Mac LLC].[25]

The Information Statement also summarized key provisions of the proposed Limited Liability Company Agreement for MacArthur Group, LLC (the "LLC Agreement"), which was attached as an exhibit.[26]  Some of these provisions materially restrict the rights MacArthur stockholders held while the Company was a corporation.[27]  Plaintiff principally takes issue with Section 13.9, a fiduciary duty waiver provision.  Section 13.9 provides that "each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may

---

[22] Information Statement at MacArthur-001020–21 ("[E]ach share of [MacArthur] Common Stock that is issued and outstanding immediately prior to the Effective time shall automatically be cancelled, extinguished, and converted into one (1) unit representing a membership interest in [Mac LLC].").

[23] *Id.* at MacArthur-001017.

[24] *Id.*

[25] *Id.*

[26] *Id.* at MacArthur-001027–28, MacArthur-001088–1131.

[27] Am. Compl. ¶¶ 118–122.

6

be implied by applicable law."[28]  The Information Statement contained the following summary of that provision:

> **Fiduciary Duty Waiver.**  The [LLC Agreement] eliminates fiduciary duties implied by applicable law that certain Covered Persons (which includes the Board of Managers, the Partnership Representative, and officers of [Mac LLC]), [Mac LLC], and the Members, may owe to each other or to any other person that is a party to or otherwise bound by the [LLC Agreement].  The [LLC Agreement] also provides that to extent not prohibited by law, no Covered Person will be liable, for damages or otherwise, to [Mac LLC] or to any Member for any loss that arises out of any act performed or omitted to be performed by it, him or her, in its, his or her capacity as a Covered Person; and [Mac LLC] will indemnify and hold harmless Covered Persons against certain legal actions brought against him or her on account of service provided to [Mac LLC].[29]

The LLC Agreement also limits the right to call member meetings to certain individuals or groups:  Section 6.4 provides that meetings can only be called by the Board, by a member or group of members holding more than 50% of the membership units, or the CEO or President.[30]  Finally, the LLC Agreement restricts the right to transfer membership interests:  Section 11.1 prohibits third-party transfers unless a member obtains "the prior approval or written consent of the Board of Managers."[31]

---

[28] D.I. 87 Ex. 5 [hereinafter "LLC Agreement"] § 13.9.

[29] Information Statement at MacArthur-001028.

[30] LLC Agreement § 6.4.

[31] *Id.* § 11.1.

7

In response to the Information Statement, all MacArthur stockholders except for Plaintiff approved and executed the written consent authorizing the Merger.[32] Sauer's consent was decisive.[33] All MacArthur stockholders except for Plaintiff also executed the LLC Agreement.[34] The Merger became effective on February 9, 2023.[35]

### C. Plaintiff Demands Appraisal; Discovery Reveals Sauer's and Myers's Use of Company Funds.

On January 20, 2023, Plaintiff demanded appraisal of his shares.[36] Realizing his initial demand was premature, Plaintiff sent a second demand for appraisal on March 1.[37] On April 10, Plaintiff filed his Verified Petition for Appraisal of Stock.[38]

Appraisal discovery revealed that throughout MacArthur's lifetime, behind the scenes, Sauer and Myers "repeatedly used their control over" MacArthur's funds and framework for personal purposes.[39] Plaintiff amended his petition to add claims

---

[32] D.I. 87 Ex. 4.

[33] *Id.*

[34] *See* LLC Agreement.

[35] Am. Compl. ¶ 12.

[36] D.I. 87 Ex. 6; Am. Compl. ¶ 156.

[37] D.I. 87 Ex. 7; Am. Compl. ¶ 156.

[38] D.I. 1.

[39] Am. Compl. ¶¶ 54, 54–103.

for breach of fiduciary duty in connection with the Merger, based on the information acquired during discovery.[40] Plaintiff alleges six categories of misconduct.

### 1. Personal Expenditures

Since MacArthur's inception, Sauer and Myers have used the Company's funds for personal expenditures.[41] These expenditures include a $75,000 advance payment on Sauer's personal residence in Corona Del Mar;[42] payments totaling $134,140 to Sauer's personal stylist;[43] and Zelle transfers totaling $250,000 to Sauer's wife, Natalie Kratts, a quarter of which was used to cover wedding costs.[44]

Sauer was neither shy nor secretive about his use of the Company's funds. He told a renting agent that he "run[s] most of [his] expense through the company, and make[s] frequent owner draws as needed/desired[.]"[45] He told that agent that to

---

[40] *See* D.I. 47.

[41] Am. Compl. ¶¶ 54–60, 69–70.

[42] *Id.* ¶ 56.

[43] *Id.* ¶ 70 n.4.

[44] *Id.* ¶ 57. About $60,000 of the Zelle transfers to Kratts covered costs relating to Sauer's and Kratts's June 2022 wedding. *Id.* Kratts emailed Sauer a nonexhaustive list of expenses totaling approximately $60,000 related to the wedding. *Id.* Sauer responded that he would transfer the necessary funds, but that he would do so through Zelle "because he wanted to avoid 'pay[ing] directly and hav[ing] the vendors name show up on the company statement.'" *Id.* Sauer told Kratts it was "[b]etter to simply have [the Company funds] go to you and categorize it as 'Loan to Officer.'" *Id.*

[45] *Id.* ¶ 56.

mitigate concerns about his "abysmal" credit score, Sauer could pay "at least 4 to 6 months' worth" of rent up front from company funds.[46]

## 2. Insider Loans

Sauer and Myers caused MacArthur to reclassify the personal expenditures as loans (the "Insider Loans").[47] For example, a portion of Sauer's personal expenditures was reclassified as a single, unsecured, interest-only, ten-year loan dated February 15, 2022, for $621,752.95, with a 1.92% interest rate.[48] MacArthur also issued two unsecured, interest-only, ten-year loans with a 1.92% interest rate to Myers: a $100,000 loan on April 1, and a $65,800 loan on August 1.[49] In addition to borrowing money from MacArthur, Myers loaned money to the Company at an interest rate of approximately 74%—38 times higher than the Insider Loans' rates.[50] On May 17, 2023, Defendants as Mac LLC's board voted to ratify the Insider Loans.[51]

---

[46] *Id.*

[47] *Id.* ¶¶ 61–73. Plaintiff alleges that the "total amount of the Personal Expenditures is believed to be materially greater" than the principal amounts assigned to the Insider Loans. *Id.* ¶ 68.

[48] *Id.* ¶ 62.

[49] *Id.*

[50] *Id.* ¶¶ 74, 75–76.

[51] *Id.* ¶ 143.

### 3. Project Gunshot

In January of 2020, Sauer entered into an agreement to use Miramar funds to secure himself equity and a CEO position.[52] MacArthur's creditor, John Doherty, founded Digital Drive Solutions, LLC ("Digital Drive"), a startup aimed at "solving and deterring gun crime."[53] Through a venture codenamed "Project Gunshot," Sauer would be named Digital Drive's CEO and receive a 5% equity grant every year that Miramar paid Digital Drive's payroll, healthcare, and hardware-related expenses.[54] Miramar funded Digital Drive's R&D for over eighteen months through a "dummy employment arrangement," paying an individual at least $87,500 to do work for Digital Drive, benefitting Sauer and Digital Drive, but not Miramar.[55]

### 4. Horse Farm

In November of 2022, MacArthur committed to pay $2,000,000 for 50 acres of rural property near a horse farm Myers frequented.[56] According to MacArthur, the land would be used to provide additional housing and rehabilitation facilities for

---

[52] *Id.* ¶ 79.

[53] *Id.*

[54] *Id.*

[55] *Id.* ¶¶ 80–81.

[56] *Id.* ¶¶ 83–85, 92. Plaintiff alleges that, at the time MacArthur was negotiating the purchase, "Myers was about to purchase (or had recently purchased) a horse of his own, named Macy Gray." *Id.* ¶ 92.

veterans.[57] Its proximity to the horse farm would also allow veterans to "obtain equine therapy services" provided by the seller.[58] But the purchase did not include the horse farm itself, and the transaction terms did not address MacArthur's or its subsidiary's ability to access the horse farm or its equine therapy services.[59] In the summer of 2023, approximately three months after the Merger, Mac LLC borrowed $1.05 million at 11.49% under an overcollaterized Commercial Promissory Note to close the transaction.[60]

### 5. Life Insurance Policy

In December of 2022, Sauer and Myers caused MacArthur to take out a whole-life life insurance policy for Sauer.[61] The policy has a face value of $14,072,046 and an annual premium of $1,000,000.[62] The policy's sole beneficiary is Kratts.[63] On December 16, MacArthur made its first quarterly premium payment of $250,000 to fund the policy.[64]

---

[57] *Id.* ¶ 87.

[58] *Id.* ¶ 88.

[59] *Id.* ¶¶ 89–91.

[60] *Id.* ¶ 143.

[61] *Id.* ¶ 94.

[62] *Id.* ¶ 95.

[63] *Id.* ¶ 96.

[64] *Id.* ¶¶ 95, 98.

### 6. Bonuses

On or around December 28, 2022, Sauer and Myers issued themselves a one-time bonus payment of $50,000 each.[65] The bonuses were neither approved by other members of the Board nor issued pursuant to a stockholder-approved compensation plan.[66]

### D.   This Litigation

Defendants moved to dismiss the amended complaint on September 26, 2024.[67] Plaintiff filed the operative Amended Complaint on December 24, 2024.[68] The Amended Complaint asserts three counts. Count I seeks appraisal of Plaintiff's 380 MacArthur shares. The remaining two counts assert direct claims for breach of fiduciary duty. Count II alleges Defendants breached their fiduciary duties by pursuing the Merger to limit potential liability for inchoate pre-Merger derivative claims. Count III alleges Defendants breached their fiduciary duties by adopting a fiduciary duty waiver to limit potential future liability. Count III also asserts a disclosure claim.

---

[65] *Id.* ¶ 100.

[66] *Id.* ¶ 101.

[67] D.I. 57.

[68] D.I. 80.

13

Defendants moved to dismiss Counts II and III under Court of Chancery Rule 12(b)(6).[69]  I heard oral argument on June 24, 2025.[70]

## II.    ANALYSIS

Defendants moved to dismiss Counts II and III under Rule 12(b)(6) for failing to state a claim on which relief can be granted.  The pleading standards under Delaware law are "minimal."[71]  On a motion to dismiss under Rule 12(b)(6) for failure to state a claim, the Court must "accept all well-pleaded factual allegations in the complaint as true, accept even vague allegations in the complaint as well-pleaded if they provide the defendant notice of the claim, [and] draw all reasonable inferences in favor of the plaintiff."[72]  The Court will grant a Rule 12(b)(6) motion if the "plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[73]

Those reasonable inferences "must logically flow from particularized facts alleged by the plaintiff."[74]  The Court need not "accept as true conclusory allegations

---

[69] D.I. 82.

[70] D.I. 96.

[71] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[72] *Id.*

[73] *Id.*

[74] *Wood v. Baum*, 953 A.2d 126, 140 (Del. 2008).

14

without specific supporting factual allegations."[75]  The Court is not "required to accept every strained interpretation of the allegations proposed by the plaintiff."[76]

Under those standards, Plaintiff pled the Merger's waiver of prospective fiduciary duties in the face of known litigation risk to Sauer was a conflicted controller transaction warranting entire fairness review; that the Merger was not entirely fair; and that Sauer and Myers, but not the rest of the MacArthur directors, breached their fiduciary duties.  Plaintiff failed to plead the Merger extinguished standing to bring MacArthur derivative claims, so that theory does not offer a path to entire fairness review or liability.  And Plaintiff failed to plead a disclosure claim.

### A.    Breach of Fiduciary Duty

Plaintiff claims Defendants breached their fiduciary duties by pursuing a Merger designed to insulate the Board from liability for both past and future conduct. Defendants include both Sauer as controller, and the remaining MacArthur directors. The parties do not dispute that Sauer controlled MacArthur at the time of the Merger.[77]

The gating question, whether the Merger is reviewable under the business judgment rule or entire fairness, hinges on whether the Merger conferred a material

---

[75] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (internal quotation marks and citations omitted).

[76] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

[77] *E.g.*, OB 4; Hr'g Tr. at 57.

15

nonratable benefit on Sauer or a majority of the directors. "The entire fairness standard applies only if the presumption of the business judgment rule is defeated."[78] As to directors, the presumption may be rebutted through "facts demonstrating that a majority of the director defendants have a financial interest in the transaction or were dominated or controlled by a materially interested director."[79] For entire fairness to apply, "an interest must be subjectively material to the director."[80] As to controllers, the plaintiffs must plead that "the controller [stood] on both sides of the transaction" or that the controller "receive[d] different consideration or derive[d] some unique benefit from the transaction not shared with the common stockholders."[81]

In pleading a breach of fiduciary duty claim, Counts II and III concern the same conduct: causing MacArthur to undergo the Merger. Both counts urge entire

---

[78] *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1371 n.7 (Del. 1995) (internal quotation marks omitted).

[79] *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002) (internal quotation marks and citation omitted).

[80] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 150 (Del. Ch. 2003); *see also Orman*, 794 A.2d at 25 n.50 ("The key issue is . . . whether the possibility of gaining some benefit or the fear of losing a benefit is likely to be of such importance to that director that it is reasonable for the Court to question whether valid business judgment or selfish considerations animated that director's vote on the challenged transaction.").

[81] *In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at *12 (Del. Ch. Oct. 24, 2014); *see also id.* at *13 (noting that entire fairness review is implicated where "the controller extract[s] something uniquely valuable to the controller, even if the controller nominally receives the same consideration as all other stockholders").

fairness review because the Merger conferred a material nonratable benefit on Sauer in the form of reduced exposure to potential liability. The counts offer different theories of that benefit. Count II asserts the Merger offered exculpation for past conduct by extinguishing derivative standing, while Count III asserts that Mac LLC's fiduciary duty waiver offered a prospective, yet nonspeculative, and complete elimination of post-Merger liability.

### 1. Count III

In Count III, Plaintiff contends the Merger handed Defendants a nonratable benefit in the form of exculpation for post-Merger misconduct because Mac LLC eliminated fiduciary duties. MacArthur stockholders could sue their directors for breaching their duty of loyalty; Mac LLC unitholders may not.[82]

Limited liability companies "are creatures of contract."[83] Indeed, it is the policy of the Delaware Limited Liability Company Act (the "LLC Act") "to give the maximum effect to the principle of freedom of contract and to the enforceability of

---

[82] MacArthur's charter exculpated its directors from liability for breaches of the duty of care. D.I. 87 Ex. 1 ¶ 9.

[83] *TravelCenters of Am., LLC v. Brog*, 2008 WL 1746987, at *1 (Del. Ch. Apr. 3, 2008); *see also Touch of Italy Salumeria & Pasticceria, LLC v. Bascio*, 2014 WL 108895, at *4 (Del. Ch. Jan. 13, 2014) ("[R]ecognizing that LLCs are creatures of contract, I must enforce LLC agreements as written."); *Henson v. Sousa*, 2015 WL 4640415, at *1 (Del. Ch. Aug. 4, 2015) ("LLCs, as this Court has repeatedly pointed out, are creatures of contract."); *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 880 (Del. Ch. 2009) ("Limited liability companies are creatures of contract, and the parties have broad discretion to use an LLC agreement to define . . . the rights and obligations of its members.").

limited liability company agreements."[84] To that end, the LLC Act grants contracting parties "wide latitude to order their relationships, including the flexibility to limit or eliminate fiduciary duties."[85] Section 18-1101(c) of the LLC Act provides that "fiduciary duties[] to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement . . . may be expanded or restricted or eliminated by provisions in the limited liability company agreement."[86] As permitted under this provision, Mac LLC's LLC Agreement contains a fiduciary duty waiver. Section 13.9 states:

> This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by applicable law. To the fullest extent not prohibited by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or applicable provisions of law or equity or otherwise, the parties hereto hereby agree that no Covered Person or Member shall owe any duties (including fiduciary duties) to the Company, any Member, or any other Person that is party to other otherwise bound by this Agreement, and any duties or implied duties (including fiduciary duties) of any Covered Person or Member to the Company, any Member or to any other such Person that would otherwise apply at law or in equity are hereby

---

[84] 6 *Del. C.* § 18-1101(b).

[85] *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *8 (Del. Ch. Apr. 20, 2009).

[86] 6 *Del. C.* § 18-1101(c).

eliminated to the fullest extent not prohibited under the Act and any other applicable law.[87]

The waiver unambiguously eliminates any and all fiduciary duties that would otherwise be owed[88] by the former MacArthur directors, now Mac LLC's board of managers, and Sauer, as Mac LLC's controlling member.[89]

---

[87] LLC Agreement § 13.9. "Covered Person" is defined to include "each Manager, the Partnership Representative or its designee (including the Designated Individual) (in such Partnership Representative's or its designee's (including the Designated Individual's) capacity as such), each such Person's officers, directors, managers, partners, members, shareholders, controlling persons, representatives and employees, and the officers of the Company." *Id.* § 13.1.

[88] *See Kelly v. Blum*, 2010 WL 629850, at *11 (Del. Ch. Feb. 24, 2010) ("[U]nless the LLC agreement in a manager-managed LLC explicitly expands, restricts, or eliminates traditional fiduciary duties, managers owe those duties to the LLC and its members and controlling members owe those duties to minority members."); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 662 (Del. Ch. 2012) ("Managers and managing members owe default fiduciary duties[.]"); *Auriga Cap. Corp. v. Gatz Props., LLC*, 40 A.3d 839, 852 (Del. Ch. 2012) ("The statute incorporates equitable principles. Those principles view the manager of an LLC as a fiduciary and subject the manager as a default principle to the core fiduciary duties of loyalty and care."), *aff'd sub nom. Gatz Props., LLC v. Auriga Cap. Corp.*, 59 A.3d 1206 (Del. 2012); *In re Atlas Energy Res., LLC*, 2010 WL 4273122, at *9 (Del. Ch. Oct. 28, 2010) ("Because the LLC Agreement does not eliminate America's fiduciary duties, America owes Energy's minority unitholders 'the traditional fiduciary duties that controlling shareholders owe minority shareholders.'" (quoting *Kelly*, 2010 WL 629850, at *11)).

[89] *See Khan v. Warburg Pincus, LLC*, 2025 WL 1251237, at *7 n.92 (Del. Ch. Apr. 30, 2025) (interpreting a waiver eliminating the fiduciary duties of each "Member, Manager or officer of the Company" as eliminating fiduciary duties owed by a controller); *Osios LLC v. Tiptree, Inc.*, 2024 WL 2947854, at *7–8 (Del. Ch. June 12, 2024) (finding that a controlling member's "status as 'Indemnified Person' [was] not, under the definition in [LLC Agreement], subject to capacity testing" and that accordingly, the controlling member "owe[d] no fiduciary duties").

19

### a. Standard of Review

As with any other action taken by a board of directors, Defendants as MacArthur directors, and Sauer as MacArthur's controller, had to comport with their fiduciary duties when they approved the Merger and adopted Mac LLC's waiver of fiduciary duties.[90] Plaintiff contends Defendants did so disloyally, to insulate themselves from future liability.[91] Plaintiff argues the Merger was a conflicted transaction that afforded a nonratable benefit sufficient to trigger entire fairness review.

In response, Defendants point to the Delaware Supreme Court's recent decision in *Maffei v. Palkon*.[92] Under *Maffei*, they say, the increased protection

---

[90] *See Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011) ("A reviewing court's role is to ensure that the corporation complied with the statute and [that its fiduciaries] acted in accordance with [their] fiduciary duties."); *Sample v. Morgan*, 914 A.2d 647, 672 (Del. Ch. 2007) ("Corporate acts thus must be 'twice-tested'—once by the law and again by equity."); *Kellner v. AIM ImmunoTech Inc.*, 320 A.3d 239, 259 (Del. 2024) ("The General Assembly's 'capacious grant of power is policed in large part by the common law of equity, in the form of fiduciary duty principles.'" (quoting *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1078 (Del. Ch. 2004), *aff'd*, 872 A.2d 559 (Del. 2005))); *In re Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 434 (Del. Ch. 2002) (noting the "fundamental rule that inequitable actions in technical conformity with statutory law can be restrained in equity"); *see also In re Invs. Bancorp, Inc. S'holder Litig.*, 177 A.3d 1208, 1223 (Del. 2017) ("[D]irectors' exercise of [their] authority must be done consistent with their fiduciary duties."); *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971) ("[I]nequitable action does not become permissible simply because it is legally possible.").

[91] Am. Compl. ¶ 173.

[92] 339 A.3d 705 (Del. 2025); *see* OB 42–46.

against future liability Defendants enjoy under Mac LLC's fiduciary duty waiver does not constitute a material nonratable benefit.[93]

*Maffei* considered a breach of fiduciary claim challenging the decision of Tripadvisor, a controlled Delaware corporation, to reincorporate in Nevada.[94] The proposal followed a series of management presentations suggesting that Nevada law would afford greater protection to directors, officers, and controllers faced with breach of fiduciary duty claims.[95] The board approved, and, at the stockholder vote, the controlling stockholder cast the decisive vote.[96] The plaintiffs claimed the reincorporation was subject to entire fairness review because it was a self-interested transaction "aimed to benefit the Companies' directors, officers, and conflicted controlling stockholder to the clear detriment of minority public stockholders."[97] The Delaware Supreme Court disagreed, holding that the business judgment rule applied because the defendant fiduciaries' reduced litigation risk did not constitute a material nonratable benefit.[98]

---

[93] OB 42–46.

[94] *See Maffei*, 339 A.3d at 710–11.

[95] *See id.* at 712–14.

[96] *See id.* at 715.

[97] *Id.* at 717.

[98] *Id.* at 731.

*Maffei* began by determining that the benefit's materiality should be assessed not only for directors, but also for controllers "where the principal focus" in the case "has been on the alleged non-ratable benefits potentially flowing to the controller."[99] In this case, as to Sauer, that is certainly the focus at this juncture, and Sauer has not argued that the benefit need not be material.

Then, *Maffei* canvassed Delaware law assessing whether decreased litigation risk or expense constitutes a material benefit, and extracted several themes. One is temporality, i.e., whether the risk was diminished prospectively, retroactively, or both.[100] *Maffei*'s dialogue with the trial court focused on whether temporality was a

---

[99] *Id.* at 731, 732; *see also id.* at 732 (noting that a materiality requirement "achieves continuity with our law in the director context where we have more explicitly stated that non-ratable benefits and financial interests must be sufficiently material in order to taint director interest").

[100] *Maffei* observed that "[c]ase law also demonstrates that courts draw a distinction between limitations of directors' liability for past acts and future acts." *Id.* at 735. "This distinction can be seen by comparing cases where directors adopted provisions under Section 102(b)(7)—which, by their terms, cannot limit directors' liability for past conduct—with cases where directors acted to extinguish existing potential liability for past conduct." *Id.*; *see, e.g.*, *Orloff v. Shulman*, 2005 WL 3272355, at *13 (Del. Ch. Nov. 23, 2005) (applying the business judgment rule to the adoption of a prospective Section 102(b)(7) provision, and explaining, "The law of Delaware is clear on the permissibility of advancing legal fees. This is especially true when . . . plaintiffs challenge the adoption of a bylaw that requires the corporation to advance litigation costs sometime in the future rather than challenging the directors' decision to advance particular litigation expenses."); *Underbrink v. Warrior Energy Serv. Corp.*, 2008 WL 2262316, at *11–13 (Del. Ch. May 30, 2008) (applying *Orloff*); *Bamford v. Penfold, L.P.*, 2022 WL 2278867, at *34 (Del. Ch. June 24, 2022) (applying entire fairness to the adoption of an exculpatory provision that "not only limited liability prospectively, but also retrospectively").

distinct element of materiality.[101]  A second theme is maturity, i.e., whether the risk was inchoate, threatened, or actualized.[102]  And a third is scope, i.e., whether and to what extent the duty of loyalty was waived.[103]

---

[101] *See Maffei*, 339 A.3d at 733, 741.  *Maffei*'s temporal distinction is not a binary proxy for materiality.  To the contrary, the Delaware Supreme Court expressly noted that limiting liability retrospectively "*may* convey a non-ratable benefit on fiduciaries," and limiting liability prospectively "*does not automatically* convey a non-ratable benefit."  *Id.* at 733, 739 (emphasis added).

[102] *Maffei* observed that "advancement cases show that entire fairness review does not apply to director decisions to adopt provisions regarding the advancement of litigation expenses when those provisions are adopted without regard to any particular litigation or expenses."  *Id.* at 734.   And *Maffei* reviewed three cases applying entire fairness in the litigation risk context where the defendant fiduciaries acted under a "cloud of litigation relating to past conduct." *Id.* at 736–38.  *See, e.g.*, *Bamford*, 2022 WL 2278867, at \*35 (noting that "[a controller] faced claims for breach of the duty of loyalty based on his past conduct" and "sought to cut off that threat and benefit himself through the adoption of the Exculpatory Provision"); *Harris v. Harris*, 2023 WL 115541, at \*6 (Del. Ch. Jan. 6, 2023) (noting that the defendants began devising a reincorporation a week after the plaintiff "started asking questions" and consummated the plan less than two weeks after the plaintiff sent a written demand for documents); *In re Riverstone Nat'l, Inc. S'holder Litig.*, 2016 WL 4045411, at \*5 (Del. Ch. July 28, 2016) (noting that the defendants effectuated a merger to extinguish their existing potential liability after the plaintiffs notified the defendants of claims that the defendants "breached their fiduciary duty by improperly usurping [an] opportunity").

[103] *Maffei* echoed this Court's explanation in *Bamford* that "[f]iduciaries who control an entity can adopt prospective protective provisions, including exculpatory provisions, particularly if the provisions do not implicate the duty of loyalty." 339 A.3d at 736 (quoting 2022 WL 2278867, at \*34).  *Maffei* suggests degrees of exculpation of the duty of loyalty. The Delaware Supreme Court applied the business judgment rule to Tripadvisor's reincorporation to Nevada, even though Nevada's statutory scheme permits exculpation for duty of loyalty breaches, while noting "the Nevada statute does not provide *complete* exculpation from duty of loyalty breaches." *Id.* at 711, 736 n.216 (emphasis added). "Rather, the Nevada statute does not permit exculpation for 'intentional misconduct, fraud, or knowing violation of the law.'" *Id.* at 736 n.216 (citing N.R.S. 78.138(7), and the State of Nevada's amicus brief).

I read *Maffei*'s guidance on materiality to encompass temporality, maturity, and scope, like the precedent it relies on. It teaches that a waiver that is both retroactive and prospective, enacted in the shadow of actual litigation, and waives the duty of loyalty to the point of excusing intentional misconduct would be material.[104] A waiver that is prospective, enacted on a clear day, and leaves the duty of loyalty undisturbed would not be material.[105] There is much room in between. The Delaware Supreme Court found the *Maffei* reincorporation exculpated liability prospectively, was approved on a clear day, and intruded on the duty of loyalty but not to the point of intentional misconduct, and concluded it was not a material benefit to Tripadvisor's fiduciaries.[106]

---

[104] *See, e.g.*, *Bamford*, 2022 WL 2278867, at *33–35; *Riverstone*, 2016 WL 4045411, at *15 (finding that the defendants "secured a valuable benefit" from a merger "which precluded prosecution of those [duty of loyalty] claims derivatively, as a matter of law, and precluded the acquirer's pursuit of the claims as a matter of contract").

[105] *See Maffei*, 339 A.3d at 733 (applying the business judgment rule where "the absence of any allegations that any particular litigation claims will be impaired or that any particular transaction will be consummated post-conversion, weighs heavily against finding that the alleged reduction in liability exposure under Nevada's corporate law regime is material"); *Orloff*, 2005 WL 3272355, at *13 (applying the business judgment rule to the adoption of a Section 102(b)(7) provision); *Underbrink*, 2008 WL 2262316, at *13 (applying the business judgment rule to the "adoption of a bylaw that requires the corporation to advance litigation costs sometime in the future rather than . . . advance particular litigation expenses" (citing *Orloff*, 2005 WL 3272355, at *13)).

[106] *Maffei*, 339 A.3d at 739 ("[T]he hypothetical and contingent impact of Nevada law on unspecified corporate actions that may or may not occur in the future is too speculative to constitute a material, non-ratable benefit triggering entire fairness review."); *id.* at 741 n.249 ("[T]he record here suggests the existence of a 'clear day' and the absence of any material non-ratable benefits flowing to the controller or directors as a result of the

24

Here, Mac LLC's fiduciary duty waiver secured for the former MacArthur directors a waiver that is prospective. And Mac LLC's fiduciary duty waiver eliminates "all future potential liability for *all* fiduciary duty claims, including claims for breach of the duty of loyalty."[107] The parties join issue on the maturity of the MacArthur directors' litigation risk: whether fiduciary duties were waived on a clear day. Per *Maffei*, in this context, the existence of a clear day turns on whether a complaint contains "allegations that the [transaction] decisions were made to avoid any existing threatened litigation or that they were made in contemplation of any particular transaction[.]"[108] Well-pled allegations to that effect support a pleading-stage inference that a reduction in mature litigation risk is sufficiently material to trigger entire fairness review. Allegations as to "unspecified corporate actions that may or may not occur in the future" do not suffice.[109]

Plaintiff pleads particularized facts that give rise to a reasonable inference that at least Sauer, as the Company's controller, approved the Merger and adopted the fiduciary duty waiver "in contemplation" of ongoing self-dealing.[110] Sauer and

---

Conversions."); *id.* at 736 n.216 (noting that Nevada's statute does not exculpate fiduciaries from liability for "intentional misconduct, fraud, or knowing violation of the law" (quoting N.R.S. 78.138(7))).

[107] AB 55–56 (emphasis in original).

[108] *Maffei*, 339 A.3d at 739.

[109] *Id.*

[110] *Id.*

Myers caused MacArthur to take out a $14 million face value whole-life life insurance policy for the sole benefit of Sauer's wife in mid-December of 2022.[111] Defendants approved the Merger on December 14.[112] Sauer and Myers then approved a $250,000 premium payment on December 16, with the expectation that the next premium payment would be due around March of the following year.[113]

These allegations support a reasonable inference that Sauer and Myers "contemplat[ed]" post-Merger disloyal diversions of company funds when pursuing the Merger and its waiver of liability.[114] The chronology of events embedded in those allegations make it reasonably conceivable that Sauer and Myers contemplated continued disloyal payments for the Life Insurance Policy benefitting Sauer's wife. It is reasonably conceivable that each payment would breach Sauer's and Myers's duty of loyalty. But, according to Plaintiff, Sauer obtained a waiver of their fiduciary duties before the next payment came due.[115] Liability for future disloyalty was thus

---

[111] Am. Compl. ¶¶ 94–96.

[112] Am. Compl. ¶ 110.

[113] *See id.* ¶¶ 95, 98; AB 54. Plaintiff also pleads that, approximately three months after the Merger closed, Defendants voted to ratify the Insider Loans; and that less than a month after the ratification, Mac LLC borrowed $1.05 million under an overcollateralized Commercial Promissory Note with a 11.49% interest rate to close the disloyal horse farm transaction. Am. Compl. ¶ 143. Defendants tangle with whether these allegations present post-Merger liability. Because the Life Insurance Policy allegations are enough to make the liability waiver material, I do not reach these disputes today.

[114] *Maffei*, 339 A.3d at 739.

[115] *See* Am. Compl. ¶¶ 95, 98; AB 54.

neither "hypothetical" nor "speculative."[116] Plaintiff has pled the fiduciary duty waiver was adopted on a rainy day.

And so, Plaintiff has pled Sauer obtained a prospective, nonspeculative and absolute waiver of the duty of loyalty that relieved him of liability for disloyal behavior he knew he would continue, and indeed had promised to continue. On the spectrum of waivers, I believe this one is material. The Amended Complaint adequately alleges the fiduciary duty waiver was adopted at least "in contemplation of [a] particular transaction"—the Life Insurance Policy.[117] Under *Maffei*, Plaintiff has sufficiently pled the fiduciary duty waiver conveys a material nonratable benefit to Sauer. Given Sauer's undisputed status as MacArthur's controller, that tees up entire fairness review.[118]

### b. Entire Fairness

"Once a plaintiff rebuts the business judgment rule, the burden shifts to the defendant[s] to establish that the merger was the product of both fair dealing and fair price."[119] "[T]he test for fairness is not a bifurcated one as between fair dealing and

---

[116] *Maffei*, 339 A.3d at 739.

[117] *Id.*

[118] *See id.* at 730 ("[W]here a controlling stockholder transacts with the controlled corporation and receives a non-ratable benefit, the presumptive standard of review is entire fairness." (quoting *In re Match Grp., Inc. Deriv. Litig.*, 315 A.3d 446, 460 (Del. 2024))).

[119] *Riverstone*, 2016 WL 4045411, at *15 (citing *Calma ex rel. Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 589 (Del. Ch. 2015)).

price. All aspects of the issue must be examined as a whole since the question is one of entire fairness."[120] Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[121] Fair price relates to whether the minority stockholder received "the substantial equivalent in value of what he had before."[122] Because the entire fairness inquiry is fact intensive, "[t]he applicability of the entire fairness standard 'normally will preclude a dismissal of a complaint on a Rule 12(b)(6) motion to dismiss.'"[123] "The pleading standard here is low—the Plaintiffs need only plead 'some facts' supporting an unfair process or price."[124]

Plaintiff clears that bar. At bottom, Plaintiff alleges a controller and his right-hand man pursued and extracted unique benefits from an unfair merger. He pleads Sauer and Myers looted the Company and caused it to engage in a series of self-interested transactions for years—including in the weeks leading up to and after the

---

[120] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

[121] *Id.*

[122] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 940 (Del. 1985) (quoting *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 114 (Del. 1952)).

[123] *Riverstone*, 2016 WL 4045411, at *15 (quoting *Orman*, 794 A.2d at 20 n.36).

[124] *Manti Hldgs., LLC v. Carlyle Grp. Inc.*, 2022 WL 1815759, at *10 (Del. Ch. June 3, 2022) (citing *Stein v. Blankfein*, 2019 WL 2323790, at *8 (Del. Ch. May 31, 2019)).

Merger.[125]  No procedural protections were used, and no one bargained for the minority.  The Merger gave Sauer and Myers a prospective and complete get-out-of-jail-free card for post-Merger disloyalty, when they knew disloyalty would continue at least as to the Life Insurance Policy's premium payments.  In return, Plaintiff, the "only non-director MacArthur stockholder who is truly an outsider," was offered an interest in a company whose fiduciaries can no longer be sued for breaching their fiduciary duties.[126]  It is reasonably conceivable that the Merger was not entirely fair.

### c.    Standard Of Conduct

So far, I have concluded Plaintiff has pled the Merger is a conflicted controller transaction subject to entire fairness review, and that Plaintiff has pled the Merger was not entirely fair.  Implicit in those latter two conclusions is the conclusion that Plaintiff has pled Sauer breached his fiduciary duties as a MacArthur director, and as MacArthur's controller, in securing for himself a personal, nonratable, and material liability waiver.  Some additional explanation is necessary.

This Court "refuse[s] to presume that an independent director is not entitled to the protection of the business judgment rule solely because the controlling stockholder may itself be subject to liability for breach of the duty of loyalty if the

---

[125] *See* Am. Compl. ¶¶ 54–103, 143.

[126] *Id.* ¶ 120.

transaction was not entirely fair to the minority stockholders."[127]  As such, the Court considers each director "individually when the directors face claims for damages in a suit challenging board action."[128]  Where "a plaintiff seeks to hold multiple directors protected by an exculpatory provision liable for breach of fiduciary duty, that plaintiff must well-plead a loyalty breach against each individual director[.]"[129] "[S]o-called 'group pleading' will not suffice."[130]  "The liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any) . . . can vary for each director."[131]

Because Defendants, as MacArthur directors, were protected by a Section 102(b)(7) exculpatory provision,[132] the Amended Complaint must plead facts "supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith."[133] The Amended Complaint meets that standard only as to Sauer and Myers.

---

[127] *In re Cornerstone Therapeutics, Inc. S'holder Litig.*, 115 A.3d 1173, 1183 (Del. 2015).

[128] *Id.* at 1182.

[129] *In re Tangoe, Inc. S'holders Litig.*, 2018 WL 6074435, at *12 (Del. Ch. Nov. 20, 2018).

[130] *Id.* (citing *Cornerstone*, 115 A.3d at 1179).

[131] *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *38 (Del. Ch. May 3, 2004).

[132] D.I. 87 Ex.1 ¶ 9.

[133] *Cornerstone*, 115 A.3d at 1179–80.

The Amended Complaint supports a reasonable inference that Myers approved the Merger to shield Sauer, and himself, from future liability. Plaintiff pleads Myers swore fealty to Sauer, not to MacArthur or its stockholders. Since MacArthur's inception, Sauer and Myers operated in lockstep to divert MacArthur funds to themselves. Sauer and Myers engaged in a vast majority of the pre-Merger misconduct hand-in-glove, for themselves and for each other.[134] The Insider Loans capture their reciprocal relationship: "Sauer agreed to approve the Myers Loan in exchange for Myers approving the Sauer Loan."[135] Myers enjoys Mac LLC's fiduciary duty waiver, and Myers approved the Life Insurance Policy payments with the expectation they would continue after the Merger. The chronology and logic underlying the conclusion that the waiver conferred a material nonratable benefit to Sauer supports the inference that Myers voted for it disloyally, for Sauer and for himself.

---

[134] *See* Am. Compl. ¶ 55 ("Sauer and Myers improperly diverted Company funds for self-interested reasons throughout the life of MacArthur[.]"); *id.* ¶ 61 ("Sauer and Myers ultimately caused the Company to retroactively 'reclassify' at least a portion of the Personal Expenditures as personal loans[.]"); *id.* ¶ 94 ("Sauer and Myers caused MacArthur to take out a whole-life life insurance policy . . . for Sauer[.]"); Am. Compl. ¶ 95 ("Sauer and Myers caused MacArthur to take out a whole-life life insurance policy (the "Life Insurance Policy") for Sauer[.]"); *id.* ¶ 100 ("Sauer and Myers caused the Company to issue themselves each a one-time bonus payment in the amount of $50,000[.]"). The one exception is Project Gunshot, which Sauer facilitated on his own. *Id.* ¶¶ 79–82.

[135] *Id.* ¶ 64.

Plaintiff has not pled a nonexculpated claim against the remaining four director Defendants: Minot, Piccioni, Mast, and O'Neil. Plaintiff does not allege they received any material benefit from the Merger or the fiduciary duty waiver. He does not allege any of the remaining directors engaged in misconduct or faced liability. Nor does he allege those directors lack independence or are beholden to Sauer and Myers.

Count III appears to be based on the theory that because all directors enjoy the fiduciary duty waiver's protection, all directors breached their fiduciary duties. That is precisely the type of analysis *Maffei* rejected. Prospective liability protection can confer a material nonratable benefit when it impairs existing liability or facilitates a particular transaction.[136] Here, Sauer and Myers are the only fiduciaries alleged to have engaged in any misconduct. They alone face a likelihood of liability on any potential claims. And they alone engaged in conduct that inferably made the fiduciary duty waiver a unique benefit.[137] Count III is dismissed against Minot, Piccioni, Mast, and O'Neil.

---

[136] *See Maffei*, 339 A.3d at 733.

[137] *See Bamford*, 2022 WL 2278867, at *35 ("Superficially, the Exculpatory Provision treated all Covered Persons equally. But because [the controller] had engaged in misconduct and faced litigation risk, it was really [the controller] who benefitted.").

## 2. Count II

In Count III, Plaintiff has pled a path to entire fairness review based on Mac LLC's liability waiver. Count II offers another path, styled as a separate count based on the same conduct, that Defendants have moved to dismiss. It does not lead to entire fairness.

Count II alleges Defendants disloyally approved the Merger to eliminate equityholder standing to bring pre-Merger derivative claims. Plaintiff presses the Merger handed Defendants a nonratable benefit in the form of exculpation for pre-Merger misconduct because usually, a merger extinguishes a target stockholder's ability to bring a derivative suit.[138] "[T]he derivative claim—originally belonging to the acquired corporation—is transferred to and becomes an asset of the acquiring corporation as a matter of statutory law."[139]

---

[138] *Lewis v. Anderson*, 477 A.2d 1040, 1049 (Del. 1984); *see also Lewis v. Ward*, 852 A.2d 896, 901 (Del. 2004) ("When a merger eliminates a plaintiff's shareholder status in a company, it also eliminates her standing to pursue derivative claims on behalf of that company. Those derivative claims pass by operation of law to the surviving corporation, which then has the sole right and standing to prosecute the action."); *Schreiber v. Carney*, 447 A.2d 17, 21 (Del. Ch. 1982) ("[A] merger which eliminates a complaining stockholder's ownership of stock in a corporation also ordinarily eliminates his status to bring or maintain a derivative suit on behalf of the corporation, whether the merger takes place before or after the suit is brought[.]").

[139] *Ark. Tchr. Ret. Sys. v. Countrywide Fin. Corp.*, 75 A.3d 888, 894 (Del. 2013) (citing *Anderson*, 477 A.2d at 1049–50).

As an initial matter, the parties sparred over whether Plaintiff has standing to bring Count II. In a prefatory analysis, I conclude Plaintiff has direct standing to bring his claim under *Parnes v. Bally Entertainment Corp*.[140]

But I conclude Count II does not offer a path to entire fairness, because the Merger was a reorganization that did not actually extinguish derivative standing. So the Merger cannot offer diminished retroactive liability exposure as a nonratable benefit.

### a. Standing

Plaintiff offers Count II under *In re Primedia, Inc. Shareholders Litigation*, as a direct claim challenging a merger based on a board's failure to secure value for material derivative claims.[141] *Primedia* claims carry stringent standing requirements[142] in order to differentiate between claims that properly attack a merger on the grounds that it deprived stockholders of value they were entitled to, and claims

---

[140] *Parnes v. Bally Ent. Corp*., 722 A.2d 1243 (Del. 1999).

[141] 67 A.3d 455 (Del. Ch. 2013).

[142] *See id.* at 477 ("First, the plaintiff must plead an underlying derivative claim that has survived a motion to dismiss or otherwise could state a claim on which relief could be granted. Second, the value of the derivative claim must be material in the context of the merger. Third, the complaint challenging the merger must support a pleadings-stage inference that the acquirer would not assert the underlying derivative claim and did not provide value for it.").

that merely attempt to reassert pre-merger derivative claims.[143] The parties engaged heavily on whether Plaintiff satisfied those requirements.

But in my view, Plaintiff's claim is not a *Primedia* claim. Plaintiff does not contend MacArthur's Board failed to pay MacArthur stockholders for pending or threatened derivative claims that passed to Mac LLC in the Merger. Plaintiff instead contends Defendants orchestrated a conversion by merger "for self-interested reasons"—namely, to extinguish any potential existing liability and to preclude future breach of fiduciary duty claims.[144] The Merger itself is the breach.

As in *In re Riverstone National, Inc. Stockholder Litigation*, Plaintiff's claim is "a common or garden variety allegation of director interest, in direct challenge to the merger as unfair."[145] *Riverstone* involved a merger that extinguished a "threatened but not yet pending" corporate opportunity claim.[146] The merger

---

[143] *Id.*; *Morris v. Spectra Energy P'rs (DE) GP, LP*, 246 A.3d 121, 136 (Del. 2021) ("When the court is faced with a post-merger claim challenging the fairness of a merger based on the defendant's failure to secure value for derivative claims, we think that the *Primedia* framework provides a reasonable basis to conduct a pleadings-based analysis to evaluate standing on a motion to dismiss."); *see also In re Orbit/FR, Inc. S'holders Litig.*, 2023 WL 128530, at *3 (Del. Ch. Jan. 9, 2023) ("Defendants view these allegations as an attempt by Plaintiff to reify, post-merger under *Primedia*, an inchoate breach of duty claim existing pre-merger, and that was extinguished in the merger.").

[144] Am. Compl. ¶¶ 164, 173.

[145] *Riverstone*, 2016 WL 4045411, at *1.

[146] *Id.*

agreement released all potential liability concerning the claim.[147] There, as here, the plaintiffs alleged directors disloyally facilitated a merger to extinguish the claim forever.[148] And there, as here, the parties initially treated *Primedia* as the controlling framework for standing.[149] Vice Chancellor Glasscock declined to assess the plaintiffs' standing under *Primedia*, observing that "the issue here is more fundamental: [the] matter involves a common or garden variety allegation of director interest, in direct challenge to the merger as unfair."[150] Put simply, the plaintiffs asserted a direct attack on the fairness of the merger price and process.

Citing *Parnes*, Vice Chancellor Glasscock stated the *Riverstone* plaintiffs "undoubtedly have standing" to bring their direct claim.[151] In *Parnes*, our Supreme Court held that a plaintiff retains direct standing to challenge "the validity of [a] merger itself," by "charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price."[152] Subsequent cases explained a plaintiff may

---

[147] *See id.* at \*8 ("[T]he acquirer agreed not to pursue litigation including, implicitly, the Usurpation Claims. Thus, the chose-in-action, as an asset, was not sold, but was obliterated[.]").

[148] *Id.* at \*1, \*8.

[149] *Id.* at \*1.

[150] *Id.*

[151] *Id.* at \*8 (citing *Parnes*, 722 A.2d at 1245).

[152] *See Parnes*, 722 A.2d at 1245 ("A stockholder who directly attacks the fairness or validity of a merger alleges an injury to the stockholders, not the corporation, and may pursue such a claim even after the merger at issue has been consummated.").

bring a direct claim challenging a merger's fairness based on its treatment of derivative claims.[153] Like the *Riverstone* plaintiffs, Plaintiff here has standing to bring that direct claim under *Parnes*.[154]

### b. Standard of Review

Delaware law recognizes two circumstances in which a merger will not extinguish derivative standing. One exception applies when the merger itself is the subject of a fraud claim, "perpetrated merely to deprive shareholders of the standing to maintain a derivative action."[155] Defendants press the other exception: a merger does not extinguish derivative standing when it is "in reality a reorganization which

---

[153] *See, e.g.*, *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1251 (Del. 2016) ("Under our law, equity holders confronted by a merger in which derivative claims will pass to the buyer have the right to challenge the merger itself as a breach of the duties they are owed." (citing *Parnes*, 477 A.2d at 1245)); *In re Massey Energy Co.*, 2011 WL 2176479, at *17 (Del. Ch. May 31, 2011) (explaining *Parnes* permits "a plaintiff to attack a merger directly if the target board agreed to a materially inadequate, and therefore unfair, price because the price did not reflect the value of certain assets"—i.e., litigation assets).

[154] 722 A.2d at 1245.

[155] *Ward*, 852 A.2d at 899; *see also Ark. Tchr. Ret. Sys. v. Caiafa*, 996 A.2d 321, 323 (Del. 2010) (noting that the fraud exception applies where "directors prospectively sought and approved a merger, solely to deprive stockholders of standing to bring a derivative action"); *Bamford v. Penfold, L.P.*, 2020 WL 967942, at *29 (Del. Ch. Feb. 28, 2020) (noting that the fraud exception applies where "a principal purpose of the transaction is the elimination of standing to assert derivative claims" (internal quotation marks and citations omitted)); *In re Match Grp., Inc. Deriv. Litig.*, 2022 WL 3970159, at *12 (Del. Ch. Sept. 1, 2022) (declining to apply the fraud exception where "[p]laintiffs stop[ped] short of pleading, as they must, that the 'merger itself' was fraudulent and was perpetrated to deprive stockholders of standing" (citing *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d at 348, 354 (Del. 1988))).

37

does not affect [the stockholder's] ownership of the business enterprise."[156]  While invoked most often in the merger context,  the reorganization exception "can apply to any transaction that amounts to little more than a 'corporate reshuffling' of ownership interests."[157]

Then-Vice Chancellor Marvel paved the way in *Helfand v. Gambee*.[158]  There, a stockholder of a New York corporation that reorganized into two Delaware corporations maintained standing to sue on behalf of one of the new corporations for acts pre-dating the reorganization.[159]  The Court reasoned that the plaintiff's possession of "'two pieces of paper rather than one' as evidence of her long investment in the corporation and its new alter ego" should not deprive her of standing.[160]  Years later in *Schreiber v. Carney*, this Court relied on *Helfand* to preserve derivative standing in the context of a stock-for-stock merger.[161]  The transaction in *Schreiber* was a stock-for-stock merger with a newly formed holding company, which retained the old company as a wholly-owned subsidiary.[162]  The *Schreiber* Court emphasized that "the merger had no meaningful effect on the

---

[156] *Anderson*, 477 A.2d at 1046 n.10.

[157] *Bamford*, 2020 WL 967942, at *28 (quoting *Ward*, 852 A.2d at 904).

[158] 136 A.2d 558 (Del. Ch. 1957).

[159] *See id.* at 562.

[160] *Schreiber*, 447 A.2d at 22 (discussing *Helfand*).

[161] *Id.*

[162] *Id.*

plaintiff's ownership of the business enterprise" because "[t]he structure of the old and new companies [was] virtually identical except for a slight dilution in the overall stock holdings."[163] In other words, the plaintiff's "equity interest in the business entity [was] really still the same."[164]

Consistent with both *Helfand* and *Schreiber*, subsequent cases invoking the reorganization exception have repeatedly asked a simple question: is the surviving

---

[163] *Id.*

[164] *Id.*

entity "merely the same corporate structure under a new name[?]"[165]  If the answer

is "yes," derivative standing survives.[166]

Here, my answer to that question is "yes."  The Merger was "the epitome of a

corporate reshuffling."[167]  As in *Schreiber*, the Merger was "merely a share for share

merger with a newly formed [entity] . . . with the shareholders of the old company

---

[165] *Bonime v. Biaggini*, 1984 WL 19830, at *3 (Del. Ch. Dec. 7, 1984); *see, e.g.*, *Siegel v. Cantor Fitzgerald, L.P.*, 2025 WL 1074604, at *13–14 (Del. Ch. April 10, 2025) (applying the reorganization exception to a transaction where the "Class A stockholders' economic interests were unchanged"); *Bonime*, 1984 WL 19830, at *3 (declining to apply the reorganization exception to "a merger of two distinct corporations each of which had separate boards, officers, assets and stockholders"); *Match*, 315 A.3d at 474 (declining to apply the reorganization exception where the surviving entity had "an expanded board with different board members, and a different capital structure with a single class of stock instead of two").

*Helfand* and *Schreiber* both discussed another reason why the reorganization exception applied, which later cases do not discuss.  In *Helfand*, the defendants moved to dismiss for lack of standing on the basis that the plaintiff had voted in favor of the reorganization.  136 A.2d at 560–61.  The defendants argued the language of 8 *Del. C.* § 327 requires an absence of voluntary action.  *Id.*  The Court concluded no disqualifying voluntary action had been pled, as voting for a reorganization plan designed to meet a mandatory antitrust consent decree "should not be deemed a vote to absolve corporate directors from suit."  *Id.* at 561.  *Schreiber* later noted that "[t]he [*Helfand*] Court focused on the involuntary nature of the transaction, in that it was pursuant to consent decree."  447 A.2d at 21.  Although *Schreiber* did not involve a similarly "involuntary" transaction, the Court noted the *Schreiber* plaintiff's "position is involuntary insofar as he voted against the merger and his equity interest in the business entity is really still the same." *Id.* at 22.

Later cases do not examine the involuntariness of the transaction or the plaintiff's position when determining whether the reorganization exception applies.  But to the extent that it remains an element to consider, I note that here, as in *Schreiber*, Plaintiff's position is involuntary insofar as he did not vote for the Merger.

[166] *See Harris*, 2023 WL 115541, at *10 ("When those exceptions apply, the plaintiffs can continue litigating their derivative claims as derivative claims, and the case proceeds as if the merger never happened.").

[167] *Bamford*, 2020 WL 967942, at *29.

owning all the shares of the new [entity]."[168]  It was not "a merger of two distinct corporations each of which had separate boards, officers, assets and stockholders."[169] The only parties to the Merger were MacArthur and a shell limited liability company devoid of any assets or operating business.  Board composition remained the same.[170]  Ownership structure remained the same.[171]  In short, "no one's economic interests changed."[172]

Plaintiff attempts to complicate this straightforward analysis.  He argues the Merger "fundamentally altered" the MacArthur enterprise because it constrained his rights to sue, sell, and vote.[173]  The Merger constrained his right to sue because (1) the LLC Agreement contains a fiduciary duty waiver; (2) the LLC Agreement contains a fee-shifting provision authorizing recovery of "all attorney's fees and costs actually incurred by the prevailing party"; and (3) the LLC Act does not

---

[168] 447 A.2d at 22.

[169] *Bonime*, 1984 WL 19830, at *3.

[170] Information Statement at MacArthur-001032 ("[T]he managers of the Surviving Entity shall be Thomas Sauer, Maria Mast, Winthrop Minot, Brian Piccioni, Colin Myers, and Justin O'Neil.").

[171] *Id.* at MacArthur-001020–21 ("[E]ach share of [MacArthur] Common Stock that is issued and outstanding immediately prior to the Effective time shall automatically be cancelled, extinguished, and converted into one (1) unit representing a membership interest in [Mac LLC].").

[172] *Bamford*, 2020 WL 967942, at *29.

[173] *See* AB 30–32.

provide statutory appraisal rights.[174] The Merger constrained his right to sell because the LLC Agreement contains a transfer restriction provision that subjects third-party transfers to "the prior approval or written consent of the Board of Managers."[175] Because Plaintiff is a non-director stockholder, he argues, Defendants may "weaponiz[e]" the provision against him.[176] And the Merger constrained his right to vote because the LLC Act does not contain voting requirements analogous to those found in Section 242(b)(2) and Section 271 of the DGCL.[177]

Plaintiff's argument is unavailing. *Bamford v. Penfold, L.P.* applied the reorganization exception to a transaction that restructured a Delaware limited liability company into a newly formed Delaware limited partnership.[178] Because the plaintiffs were not general partners, they "could not exercise any of the voting or

---

[174] *See* Am. Compl. ¶¶ 117–20; *see also* 8 *Del. C.* § 262.

[175] *Id.* ¶¶ 121–22; AB 21; *see* LLC Agreement § 11.1.

[176] AB 21.

[177] Am. Compl. ¶ 124; AB 22; *see* 8 *Del. C.* § 242(b)(2) (requiring class-based voting for certain amendments to a corporation's charter); 8 *Del. C.* § 271 (requiring stockholder approval for the "sale, lease or exchange" of "all or substantially all" of a corporation's assets).

[178] *Bamford*, 2020 WL 967942, at *29. In *Bamford*, the Court confirmed that equitable exceptions to the continuous ownership rule may apply to transactions between contract-based entities. *See id.* at *29–30 ("[T]he continuous ownership requirement is itself a judicially created doctrine that the Delaware Supreme Court has applied to alternative entities. It seems logical that the high court would have intended to apply both the general rule and its recognized exceptions, not just the general rule.").

other governance rights that they previously held" as members of the LLC.[179]  But structurally, the business remained unchanged.  Before the restructuring, each party held a 30% interest in the enterprise.[180]  After, they each held a one-third interest in the newly formed limited partnership, which held a 90% interest in the original company.[181]  By simple math, each party continued to hold a 30% interest in the business.[182]  The loss of governance rights did not affect the Court's calculus.  And *Harris* applied the exception to a merger that converted a Delaware entity into a New Jersey entity, even though the change in domicile narrowed the plaintiff's books and records inspection rights.[183]  The Court reasoned that, other than the application of New Jersey law to the company's internal affairs going forward, "[t]here was no change in the entity."[184]  I read both cases to suggest that such changes in a stockholder's bundle of rights do not preclude a merger from qualifying as a reorganization.

---

[179] *Id.* at *2.

[180] *Id.* at *29.

[181] *Id.*

[182] *Id.*

[183] *See Harris*, 2023 WL 115541, at *6 ("[U]nder New Jersey law, inspection rights could be limited to formal documents like financial statements, minutes, and a list of stockholders.").

[184] *Id.* at *11; *see also id.* ("[T]he surviving entity held only the assets that the Company brought to the transaction.  Each share of stock in the Delaware entity was converted on a one-for-one basis into a share of stock in the New Jersey entity.").

From there, Plaintiff resorts to a policy argument. Plaintiff argues that invoking the reorganization exception defensively, to pull the rug out from under a plaintiff's claim, would "subvert the equitable concerns which animate the exception."[185] His argument is misplaced. To be sure, Plaintiff is correct that the exception is animated by equity.[186] The exception recognizes that "to deny standing" in some cases would absolve corporate fiduciaries from suit without serving Section 327's stated purpose.[187] But Plaintiff has not been denied standing in this case. I have already established that Plaintiff has direct standing to attack the Merger's price and process. The reorganization exception does not bear on Plaintiff's standing to pursue fiduciary misconduct in the Merger. It instead bears on the merits of Plaintiff's claim that Defendants extracted a nonratable benefit through the Merger. It would be poor policy to give a pleading-stage pass to a claim based on a legally defective premise.

---

[185] AB 32 (citing *Ward*, 852 A.2d at 904 (internal quotation marks omitted)).

[186] *See Rosenthal v. Burry Biscuit Corp.*, 60 A.2d 106, 111 (Del. Ch. 1948) ("[R]igidity is not needed where the equitable owner of stock is seeking to protect the corporate interests."); *Schreiber*, 447 A.2d at 22 ("Thus, it is clear that the provisions of 8 *Del. C.* § 327 are not inflexible standards and this Court, as a Court of Equity, must examine carefully the particular circumstances of each case."); *cf. Magill v. North Am. Refractories Co.*, 128 A.2d 233, 236 (Del. 1956) ("Literal reading of language leading to results quite inconsistent with the general intent of a statute is to be avoided.").

[187] *See Schreiber*, 447 A.2d at 22 ("To deny standing, therefore, would not serve to advance the stated purpose of [S]ection 327 and would open the door to great abuses.").

I therefore agree with Defendants that the reorganization exception applies. The Merger amounted to a "corporate reshuffling"[188] that left the former MacArthur stockholders' "economic interests . . . unchanged."[189] Under settled law, such a transaction does not extinguish derivative standing. The former stockholders, now members and managers of Mac LLC, may assert the pre-Merger claims "as if the merger never happened."[190] Defendants, including Sauer and Myers, did not obtain a unique benefit for themselves in the form of diminished derivative liability for past misconduct.

Beyond the Merger's effects on standing, Plaintiff makes the practical argument that the Merger offered Defendants diminished liability risk for pre-Merger conduct because "Mac LLC would never assert the underlying derivative claims."[191] This Court has recognized the risk that an acquirer's board will not bring the derivative claims against the sell-side fiduciaries whose business the acquirer

---

[188] *Bamford*, 2020 WL 967942, at *29.

[189] *Siegel*, 2025 WL 1074604, at *13–14.

[190] *Harris*, 2023 WL 115541, at *10.

[191] AB 48–51; Am. Compl. ¶¶ 138–147; 166.

45

bought.[192]  "Acquirers buy businesses, not claims."[193]  That risk of inaction is diminished when "the sufferers of the alleged breaches and the holders of the purported claims are the same persons."[194]

Plaintiff argues Mac LLC will not assert the claims because Sauer—i.e., the individual who faces the most substantial likelihood of liability on the derivative claims—has a controlling interest in Mac LLC.[195]  And Myers, who likewise faces a substantial likelihood of liability, sits on Mac LLC's board of managers with Sauer.[196]  This presents a classic independence analysis familiar from the demand futility context, albeit under Rule 12(b)(6)'s more lenient standard.  Mac LLC's six-member board stayed on from MacArthur:  Sauer, Myers, Minot, Piccioni, Mast, and O'Neil.[197]  To plead that Mac LLC's board cannot be trusted to independently consider derivative litigation against Sauer and Myers, Plaintiff must allege facts

---

[192] *New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 169 (Del. Ch. 2023); *see also id.* (noting the "human dynamics at work that make suits against sell-side fiduciaries improbable"); *Primedia*, 67 A.3d at 484 ("The acquirer may agree contractually not to sue the sell-side fiduciaries for breach of fiduciary duty.").

[193] *Rich*, 292 A.3d at 169 (quoting *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 664 (Del. Ch. 2013)).

[194] OB 41.

[195] Am. Compl. ¶¶ 139–40; AB 48–51.

[196] Am. Compl. ¶ 140.

[197] Information Statement at MacArthur-001032 ("[T]he managers of the Surviving Entity shall be Thomas Sauer, Maria Mast, Winthrop Minot, Brian Piccioni, Colin Myers, and Justin O'Neil.").

from which I can infer that at least one more member of the Board lacks independence from Sauer or Myers.[198]  Delaware law presumes directors are independent.[199]  "[A] lack of independence turns on 'whether the plaintiffs have pled facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party.'"[200]

Plaintiff focuses on Minot.[201]  He advances a single theory centered around Minot's role in allegedly plotting alongside Sauer and Myers to dilute Plaintiff's interests.[202]  Even on a reasonable conceivability standard, Plaintiff does not explain how Minot's shared desire to secure operational independence from Plaintiff supports an inference that Minot is dominated by or beholden to either of his colleagues.  Nor does Plaintiff explain how Minot's role in diluting Plaintiff disrupts

---

[198] *See United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059–61 (Del. 2021).  I cite *Zuckerberg* for its framing of independence, not its particularized pleading standard.  The inquiry before me today is under Rule 12(b)(6) and its reasonable conceivability standard.

[199] *Friedman v. Dolan*, 2015 WL 4040806, at *6 (Del. Ch. June 30, 2015) (citing *In re MFW S'holders Litig.*, 67 A.3d 496, 509 (Del. Ch. 2013)).

[200] *Marchand v. Barnhill*, 212 A.3d 805, 818 (Del. 2019) (alteration in original) (internal quotation marks omitted) (quoting *Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016)).

[201] Plaintiff does not allege the remaining three members of the Mac LLC board—Piccioni, Mast, and O'Neil—are not independent.

[202] *See* Am. Compl. ¶ 151 ("Minot would be incapable of disinterestedly and independently considering whether to assert any of the Derivative Claims because Minot would be unwilling to risk the revelation of his long-standing plans (with Sauer and Myers) to maximize their ability to control . . . MacArthur without any 'push-back from Peña.'")

the presumption that Minot would be able to impartially consider a derivative claim for unrelated disloyalty. At best, Plaintiff pleads that Sauer, Myers, and Minot shared parallel operational goals. That is not enough to find a lack of independence, at all or in bringing derivative claims against Sauer and Myers.[203] Plaintiff does not plead that Minot has derived a material benefit from his relationship with Sauer and Myers. And he has not pled any ties between the men other than their board service. Plaintiff fails to plead facts making it reasonably conceivable Mac LLC would never assert any derivative claims against Sauer or Myers.

Plaintiff has not pled the conversion effectively exculpated Sauer and Myers from pre-Merger derivative liability. Therefore, Plaintiff has not pled any material nonratable benefit flowing to Sauer or a majority of MacArthur's directors. Count III does not offer a path to entire fairness review of the Merger.

### B. Disclosure Claim

Plaintiff finally alleges Defendants breached their fiduciary duties by failing to disclose the Merger's "true purpose" in MacArthur's Information Statement.[204]

---

[203] *See Highland Legacy Ltd. v. Singer*, 2006 WL 741939, at *5 (Del. Ch. Mar. 17, 2006) ("In order to establish lack of independence, the complaint must create a reasonable doubt that a director is so beholden to an interested director that his or her discretion would be sterilized."); *Sciabacucchi v. Liberty Broadband Corp.*, 2022 WL 1301859, at *15 (Del. Ch. May 2, 2022) ("Plaintiffs seeking to show that a director was not independent must demonstrate that the director in question had ties . . . so substantial that she could not objectively discharge . . . her fiduciary duties." (internal quotation marks and citation omitted)).

[204] Am. Compl. ¶¶ 176–77.

The Information Statement provided that "[t]he decision of the [MacArthur] Board was based primarily on the benefits of [Mac LLC] being treated as a partnership for U.S. federal income tax purposes and generally not being subject to U.S. federal income tax[.]"[205] Plaintiff contends several aspects of the Merger were not germane to or necessary for tax purposes, so securing tax benefits could not have been the Merger's true purpose.[206] The "true purpose," he says, was to insulate Defendants "from potential liability for breach of fiduciary duty claims relating to pre- and post-Merger misconduct."[207] At the same time, Plaintiff acknowledges Mac LLC's fiduciary duty waiver was itself disclosed.[208]

"Corporate directors owe a fiduciary duty to their stockholders to disclose all facts material to the transaction in an atmosphere of entire candor."[209] This duty to disclose "is not an independent duty but the application in a specific context of the

---

[205] Information Statement at MacArthur-001017.

[206] AB 59 ("Peña is alleging that these aspects of the Mac LLC Agreement inferably demonstrate the falsity of the Information Statement's disclosure regarding the primary purpose of the Merger."). The list includes the decision to convert into an LLC by merger, rather than by conversion under 8 *Del. C.* § 266; the fiduciary duty waiver; the transfer restrictions; and limitations on voting and books and records inspection rights.

[207] Am. Compl. ¶ 177.

[208] AB 59; *see* Information Statement at MacArthur-001028, MacArthur-001113; LLC Agreement § 13.9.

[209] *Eisenberg v. Chi. Milwaukee Corp.*, 537 A.2d 1051, 1057 (Del. Ch. 1987) (citing *Smith v. Van Gorkom*, 488 A.2d 858, 890 (Del. 1985)).

49

board's fiduciary duties of care, good faith, and loyalty."[210]  When directors solicit stockholder action, such as the approval of a merger, they must "disclose fully and fairly all material information within the board's control."[211]  Information is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[212]  In other words, a fact is material if it "significantly alter[s] the 'total mix' of information made available."[213]

Still, "[u]nder Delaware law, a board is not required to state a plaintiff's characterization of the facts."[214]  Nor is it required to "engage in 'self-flagellation' and draw legal conclusions implicating itself in a breach of fiduciary duty from surrounding facts and circumstances prior to a formal adjudication of the matter."[215] What is required is instead "a balanced, truthful account of all matters disclosed in

---

[210] *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 858 (Del. 2015); *see also Cygnus Opportunity Fund, LLC v. Wash. Prime Grp., LLC*, 302 A.3d 430, 446 (Del. Ch. 2023) (noting that the duty of disclosure is a "contextual manifestation of the duties of care and loyalty").

[211] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

[212] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[213] *In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *32 (Del. Ch. Oct. 16, 2018) (quoting *Rosenblatt*, 493 A.2d at 944).

[214] *Stansell v. Rosensweig*, 2024 WL 2958465, at *5 (Del. Ch. June 12, 2024); *see also In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *15 (Del. Ch. Oct. 2, 2009).  ("Delaware law does not require that the proxy statement include plaintiffs' characterization . . . ."); *In re MONY Grp., Inc. S'holder Litig.*, 853 A.2d 661, 682 (Del. Ch. 2004) ("[A]s a general rule, proxy materials are not required to state . . . plaintiff's characterization of the facts.").

[215] *Stroud*, 606 A.2d at 84 n.1.

the communications with shareholders."[216] Accordingly, this Court has repeatedly rejected claims like Plaintiff's: that disclosures are materially misleading because "they fail to disclose [the] *real* reason" behind a challenged act.[217]

The Information Statement told stockholders the Merger was for tax purposes, and told them several potentially unrelated facts about how the Merger would be conducted and how the post-Merger entity would be set up.[218] Plaintiff has failed to plead the unrelated disclosures make the disclosure of the tax goal false. Rather, Plaintiff pled discussions about the conversion began with an eye toward "tax purposes."[219] Along the way, Sauer and Myers did indeed contemplate the benefits of a fiduciary duty waiver. Defendants did indeed secure those benefits. That Defendants considered those additional benefits when planning and approving the Merger does not render the disclosure materially misleading. Plaintiff has not alleged facts that contradict Defendants' stated rationale. Our law is clear that while

---

[216] *Malone v. Brincat*, 722 A.2d 5, 12 (Del. 1998).

[217] *MONY*, 853 A.2d at 681; s*ee, e.g.*, *In re Rouse Props., Inc.*, 2018 WL 1226015, at *24 (Del. Ch. Mar. 9, 2018) (rejecting the plaintiffs' claim that "disclosures relating to the Retention Plan were misleading because the Proxy did not describe why the plan was necessary and how precisely it benefited Rouse"); *Seibert v. Harper & Row, Publishers, Inc.*, 1984 WL 21874, at *6 (Del. Ch. Dec. 5, 1984) (rejecting the plaintiff's claim that disclosures were deficient because they "fail[ed] to disclose . . . that the termination of the Retirement Plan served no proper purpose").

[218] Information Statement at MacArthur-001017–28.

[219] Am. Compl. ¶ 104 (noting that Sauer, Myers, and Minor "began communicating with the Company's outside counsel" about a potential conversion "for tax purposes").

material facts must be disclosed, fiduciaries need not narrate "opinions or possibilities, legal theories or plaintiff's characterization of the facts."[220]

The Information Statement plainly discloses the material facts underlying the transaction, including the elimination of fiduciary duties, and Plaintiff recognizes as much.[221] The first few pages of the Information Statement contained summaries of key provisions in the LLC Agreement, i.e., the transfer restrictions, the fiduciary duty waiver, and voting rights.[222] And it attached as an exhibit the LLC Agreement, which lays out these provisions in full.[223] The MacArthur stockholders were neither misinformed nor uninformed about the Merger's implications. The disclosure claim must be dismissed.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**. Count II is dismissed. Count III's claim for breach of fiduciary duty is dismissed as against Minot, Piccioni, Mast, and O'Neil, but may proceed against Sauer and Myers. Its disclosure claim is dismissed.

---

[220] *Seibert*, 1984 WL 21874, at *6.

[221] AB 59 ("To be clear, Peña is not alleging that the Individual Defendants failed to disclose these aspects of the Merger (or the relevant portions of the Mac LLC Agreement[.]").

[222] Information Statement at MacArthur-001027–28.

[223] *See id.* at MacArthur-001088–1131.